No. 97-249

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 77

JENNIFER TULLY HANSEN and
FRANCES TULLY EISENMAN,

Plaintiffs and Appellants,

v.

75 RANCH COMPANY, a Montana
Corporation and PETER R. TULLY,

Defendants and Respondents.

APPEAL FROM:   District Court of the Fourteenth Judicial District,
In and for the County of Musselshell,
The Honorable John C. McKeon, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Morris J. Braden (argued); Braden Law Firm, Billings,
Montana

For Respondents:

Richard F. Gallagher (argued); Church, Harris, Johnson &
Williams, Great Falls, Montana

Submitted: January 22, 1998

Decided:   April 9, 1998
Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.


¶1    Jennifer Tully Hansen (Jennifer) and Frances Tully Eisenman (Frances) (collectively Minority Shareholders) appeal from the decision of the Fourteenth Judicial District Court, Musselshell County, determining that the Minority Shareholders were equitably estopped from asserting dissenters' rights pursuant to § 35-1-823, MCA, of the Montana Business Corporation Act, that the 75 Ranch Company (Corporation) properly offered to purchase the shares of the Minority Shareholders at a discounted rate, and that Peter Tully (Peter or Majority Shareholder) did not breach his fiduciary duty or act in an oppressive manner warranting relief to the Minority Shareholders pursuant to §§ 35-9-501 to -504, MCA.  We reverse and remand.

Background

¶2    Robert R. Tully (Robert) and Joan B. Tully (Joan), the parents of the parties to this action, established a family ranch near Roundup, Montana around 1961.  All five of the Tullys' children worked on the ranch throughout their childhood.  In 1980, the Tullys incorporated the 75 Ranch Company as a close corporation hoping to avoid estate and inheritance tax liability.  In addition, the Corporation executed a "Stockholders' Agreement" in November 1982 providing a method of transferring the shares of a deceased shareholder and restricting the transfer of shares by shareholders during their lifetime. Robert served as the President of the Corporation.  Joan served as Secretary/Treasurer.  Robert and Joan together held 25,600 shares, a majority of the stock.  Each of the five Tully children held 2,880 shares.

¶3    The record indicates that between 1980 and 1986, the Corporation held informal meetings at family gatherings over the Christmas holidays. Minutes of the meetings were kept and indicate that there was never more than one shareholder absent from a shareholder meeting.  After finishing college, Peter became more active in the ranch and served as Vice President on the Board of Directors.  In 1986, Joan Tully died and Peter's wife, Rhonda, succeeded her as Secretary/Treasurer of the Corporation. Beginning in 1987, it appears that the Corporation adhered to corporate formalities even less stringently, continuing to hold its meetings when the family gathered for the holidays and keeping family members apprised of corporate business over the telephone.

¶4    Robert passed away on June 10, 1989.  Jennifer and Peter were appointed as co-personal representatives of their father's estate.  During probate of Robert's estate, the shares were assigned a value of $12.26 per share.  Following the estate distribution, Peter owned 51 percent (20,400 of 40,000 shares) of the outstanding shares in the Corporation.  Each of Peter's siblings, including Jennifer and Frances, owned 12.25 percent (4,900 shares). Peter took over as President and Rhonda remained the Secretary/Treasurer.

¶5    Peter and Rhonda lived on the ranch and tended to the day-to-day operations of the Corporation.  They continued the informal corporate management practice.  In approximately December 1989, the shareholders discussed the possibility of selling the ranch due to difficulties arising with

coal company developments in the area.  The record indicates that at this time, Jennifer and her sister Pat Oertli told Peter that since he was the one who lived on the ranch and dealt with the operations, he and Rhonda should decide whether to sell the ranch.  However, Jennifer specified that in the event Peter chose to relocate the ranch, she desired to sell her shares in the Corporation since she had no interest in maintaining ownership in a ranch other than the family homestead.  At that time, Peter requested that Jennifer wait about a year after the family ranch was sold or exchanged before requesting a buy out of her shares.

¶6    Following the cancellation of certain grazing leases in 1992, Peter and Rhonda started exploring options for disposition of the ranch.  Peter retained legal counsel to assist in an exchange of the Montana ranch for a New Mexico ranch.  In August 1992, Peter signed and executed an agreement to exchange the properties.  The agreement required that the transaction be structured as a like-kind exchange under § 1031 of the Internal Revenue Code to avoid tax consequences.  The record reveals that the attorney retained by Peter was not aware that other shareholders would be affected by the exchange and thus did not advise Peter of the need to comply with the procedural notice requirements of the Montana Business Corporation Act.

¶7    On December 31, 1992, Peter, in his capacity as President of the Corporation, executed a Contract and Exchange Agreement for the disposition of substantially all of the Montana property.  The exchange was closed and completed on January 29, 1993.  The selling price of the Montana property was $875,000.  The purchase price of the New Mexico property was $850,000.  Peter did not provide the Minority Shareholders with notice of the proposed exchange, and did not submit copies of the exchange documents or other relevant information for shareholder approval.  Peter, however, asserted that he spoke with several of the Minority Shareholders during the process of exchanging the properties and that during those conversations none of the Minority Shareholders voiced opposition to the proposed exchange.

¶8    In April 1993, Peter received a letter from Jennifer reiterating her desire to sell her shares in the Corporation.  In response, Peter contacted the corporate accountant to determine the value of the shares in compliance with the Stockholders' Agreement.  In May 1993, Jennifer requested that Peter negotiate the purchase with her attorney.  On June 1, 1993, Peter made an initial offer of $14.63 per share.  This offer was based on a balance sheet dated November 30, 1992; however, a copy of the balance sheet was not provided with the initial offer.

¶9    On October 15, 1993, Jennifer rejected Peter's initial offer and requested a copy of the balance sheet.  Upon receiving the balance sheet and reviewing it for the first time, Jennifer realized that the share valuation applied a 30 percent minority discount.  Therefore, by letter dated December 8, 1993, Jennifer sent a counteroffer of $20.90, representing the value of a share without the discount.  In addition, Jennifer's December 8th letter informed Peter that Frances desired a buy out of her shares at the $20.90 valuation.  Peter testified that the December 8th letter was his first notice of dissenters' rights.  Not understanding the legal ramifications of dissenters' rights, Peter

consulted an attorney and then responded with a compromise offer of $15.00 per share. The Minority Shareholders rejected Peter's compromise offer and reasserted their offer of $20.90 per share. Unable to negotiate a resolution, the Minority Shareholders filed suit on March 31, 1995.

¶10 At the District Court, the Minority Shareholders asserted the following causes of action: violation of dissenting shareholders' rights, breach of contract, breach of fiduciary duty, and right to an accounting and appraisal. Peter answered by asserting that the Minority Shareholders consented to and ratified the exchange, and thus were estopped from asserting dissenters' rights. Following a bench trial, the District Court entered its Findings of Fact and Conclusions of Law determining that the Minority Shareholders were equitably estopped from asserting dissenters' rights, that the Corporation properly offered to purchase the minority shares at a discounted rate and that Peter did not breach fiduciary duties or act in an oppressive manner warranting relief pursuant to §§ 35-9-501 to -504, MCA. The following issues are presented on appeal:

¶11 1) Were the Minority Shareholders entitled to statutory notice of dissenters' rights pursuant to 35-1-831, MCA?

¶12 2) Did the District Court err in concluding that the Minority Shareholders were barred from asserting dissenters' rights pursuant to the doctrines of waiver and equitable estoppel?

¶13 3) Did the District Court err in valuing the shares at "fair market value" in accordance with the Stockholders' Agreement?

¶14 4) Did the District Court err in concluding that a minority discount should be applied to the value of the shares?

¶15 5) Did the District Court err in adopting the valuation of the Majority Shareholder's expert which included a tax discount?

¶16 6) Did the District Court err in concluding that Peter did not breach fiduciary duties or act oppressively in his negotiations with the Minority Shareholders?

¶17 7) Is either party entitled to recovery of attorney fees and costs?
We address issues 1 and 2, combine issues 3 and 4, address issue 5 and do not reach issues 6 and 7.

Discussion

¶18 As a preliminary matter, Peter asserts that the Minority Shareholders' § 27-2-211(1), MCA. The Minority Shareholders argue that the three-year period in § 27-2-211(3), MCA, applies to this action. Peter argues that the Minority Shareholders instigated this action seeking to assert rights, not recover a penalty or forfeiture or enforce a liability as § 27-2-211(3), MCA, contemplates. However, we determine that the provision Peter seeks to invoke, § 27-2-211(1)(c), MCA, also contemplates an action upon a liability

created by statute.  The distinction between the two provisions is that subsection (3) specifically applies to actions against directors or stockholders of a corporation and allows a three-year period rather than the two-year period Peter seeks to invoke.

¶19  The District Court determined that subsection (3) applied to the current action because §§ 35-11-823 to -839, MCA (provisions addressing dissenters' rights) impose obligations on a corporation and its board of directors in the event of the sale or exchange of all or substantially all of the corporate assets. In so concluding, the District Court applied a broad interpretation of "liability" which includes an obligation created by law.  We agree with the District Court's broad interpretation of liability in analyzing § 27-2-211, MCA, and determine that subsection (3), pertaining to directors and stockholders, applies 0to this case as the Minority Shareholders filed their complaint against Peter in his capacity as the Majority Shareholder and President serving on the board of directors.  We affirm the District Court's finding that the sale/exchange occurred on January 29, 1993 and that the Minority Shareholders were within the applicable three-year statutory period of limitations when they filed suit on March 31, 1995.  We conclude that the Minority Shareholders' action is not barred by the two-year statute of limitations imposed by § 27-2-211(1)(c), MCA.

### Standard of Review

¶20  The parties to this action seek to invoke this Court's equitable jurisdiction.  Section 3-2-204(5), MCA, in combination with Rule 52(a), M.R.Civ. P., control this Court's standard for reviewing equitable cases and require that findings of fact be upheld unless they are clearly erroneous. McCann Ranch, Inc. v. Quigley-McCann (1996), 276 Mont. 205, 208, 915 P.2d 239, 241. However, we determine that the issues presented in this appeal are legal in nature.  Thus, we must review the District Court's conclusions of law to determine whether the court's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

### I

¶21  1) Were the Minority Shareholders entitled to statutory notice of dissenters' rights pursuant to § 35-1-831, MCA?

¶22  Peter asserts that the Stockholders' Agreement should control the Corporation's purchase of the Minority Shareholders' shares.  In determining the rights and duties of the parties, the District Court agreed with Peter and applied the provisions of the Stockholders' Agreement.  Section 35-9-301, MCA, allows shareholders in a close corporation to enter agreements determining their rights and obligations to each other and to the corporation. In close corporations, such as 75 Ranch, shareholders' agreements restricting the manner in which shareholders may dispose of their shares are quite common.  The Stockholders' Agreement in this case indicates that the document was designed to restrict the transfer of shares by shareholders during their lifetime, to provide for a procedure for the purchase of the shares of a deceased shareholder and "generally to agree regarding the disposition of stock of the Corporation on various contingencies."  The provisions of the

Stockholders' Agreement, however, do not contemplate an exchange transaction such as occurred in this case, or any other "fundamental change" in the corporate form (e.g., merger or share exchange) that would give rise to dissenters' rights. Therefore, we determine that the Stockholders' Agreement does not control the resolution of this litigation. Rather, the provisions of the Montana Business Corporation Act apply.

¶23 The Montana Business Corporation Act was derived from the Model Business Corporation Act and its provisions virtually mirror those of the Model Act. The comments to the Model Act explain that the remedy provided by dissenters' rights statutes enables shareholders who object to extraordinary corporate transactions to dissent from the corporate action and to require the corporation to buy their shares at fair value. 3 Model Bus. Corp. Act Annotated § 13.01 at 13-8 (3d ed. 1995 Supp). The United States Supreme Court explained in Voeller v. Neilston Warehouse Co. (1941), 311 U.S. 531, 535 n.6, 61 S.Ct. 376, 377 n.6, 85 L.Ed. 322, 326 n.6, that

> [a]t common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation. This made it possible for an arbitrary minority to establish a nuisance value for its shares by refusal to co-operate. To meet the situation, legislatures authorized the making of changes by majority vote. This, however, opened the door to victimization of the minority. To solve the dilemma, statutes permitting a dissenting minority to recover the appraised value of its shares were widely adopted.

More recent versions of this remedy allow a dissenting shareholder to "demand that the corporation buy back his shares at fair value if the corporation takes an action which fundamentally alters the character of the shareholder's investment." Waters v. Double L, Inc. (Idaho App. 1987), 755 P.2d 1294, 1297 (citation omitted).

¶24 The Montana Business Corporation Act, at § 35-1-823, MCA, addresses a corporation's selling, leasing, exchanging or otherwise disposing of all or substantially all of its property otherwise than in the regular course of business. However, for such a transaction to be authorized, the statute requires that the board of directors shall first recommend the proposed transaction to the shareholders, and the shareholders entitled to vote shall approve the transaction. The corporation must notify the shareholders of the proposed shareholder meeting and that the purpose of the meeting is to consider the sale, lease, exchange or disposition of the property. The notice should be accompanied by a description of the transaction. If a proposed corporate action creating dissenters' rights is submitted to a vote at a shareholders' meeting, the notice must also state that the shareholders are entitled to assert dissenters' rights. Section 35-1-829, MCA. Furthermore, 35-1-827, MCA, provides that upon the consummation of a sale or exchange of all or substantially all of the property of the corporation other than in the usual course of business, a shareholder is entitled to dissent from the corporate action and obtain payment of the fair value of the shareholder's shares.

¶25 Section 35-1-829(2) applies when a corporation takes an action creating

dissenters' rights without a vote of the shareholders. In such a case, the corporation must give written notification to all shareholders entitled to assert dissenters' rights that the action was taken and must send them the dissenters' notice no later than 10 days after the corporate action was taken. Subsection (2) is an acknowledgment by the legislature that some corporate actions resulting in a fundamental change need not be presented, or simply are not presented, for a vote. 3 Model Bus. Corp. Act 13.20 Official Comment at 13-44, 45. The consequence of such fundamental change, however, is the same as an action where a vote is taken in that shareholders may, after the fact, assert dissenters' rights as a remedy.

¶26 The parties concede that Peter, acting as President of the Corporation, exchanged substantially all of the property of the Corporation other than in the ordinary course of business. This transaction gave rise to dissenters' rights under the Montana Business Corporation Act. Peter, however, did not, in compliance with § 35-1-823, MCA, notify each shareholder of the proposed exchange or hold a shareholders' meeting to allow the shareholders to vote on the proposed exchange. Most importantly, Peter did not, in compliance with §§ 35-1-829 and -831, MCA, give the shareholders notice of dissenters' rights before or within 10 days after the exchange.

¶27 In his defense, Peter asserts that in the course of negotiating the New Mexico transaction he discussed the exchange with the Minority Shareholders over the telephone. Peter asserts that the Minority Shareholders did not voice opposition to the exchange. In addition, Peter testified that he believed that since corporate matters had always been conducted informally, the usual manner of conducting business would be sufficient for the exchange. Peter asserts that even though the exchange was handled by the Corporation's retained counsel, it was not until he received the December 8, 1993 letter (nearly one year after the exchange) from the Minority Shareholders' counsel that he was informed of dissenters' rights. Finally, Peter asserts that by "acquiescing or consenting to, and participating in the informal operation of 75 Ranch for many years, the minority shareholders waived their rights to strict enforcement of corporate statutory rights and requirements and it would be inequitable to allow their strict assertion now."

¶28 The District Court agreed with Peter's acquiescence theory and determined that the Minority Shareholders' failure to object during the exchange transaction amounted to consent which equitably estopped them from asserting dissenters' rights. The District Court held that "[a] shareholder is not entitled to assert dissenting rights when he/she is in favor of the transaction" (citing § 35-1-830(1)(b), MCA). Jennifer asserts, however, that she informed Peter that in the event the family homestead was exchanged for another ranch, she was not interested in remaining a shareholder. In addition, the Minority Shareholders argue that the proposed exchange was never presented for their vote at a shareholders' meeting; therefore, § 35-1-830(1)(b), MCA, which bars dissenters' rights in the event a shareholder votes in favor of the proposed corporate action, does not apply in this instance. Moreover, because the Minority Shareholders were never given notice of their right to dissent, they could not possibly have knowingly waived such rights.

¶29 Section 35-1-830(1)(b), MCA, cited by the District Court as authority barring the Minority Shareholders' right to notice of dissenters' rights, states that "[i]f proposed corporate action creating dissenters' rights . . . is submitted to a vote at a shareholders' meeting, a shareholder who wishes to assert dissenters' rights . . . may not vote his shares in favor of the proposed action." We determine, however, that if the action is never presented for a vote, as in this case, § 35-1-830(1)(b) cannot be invoked to later bar minority shareholders from asserting their rights. The Minority Shareholders were not given an opportunity to vote regarding the exchange nor were they notified of their right to dissent from the Corporate exchange; therefore, we determine that the Minority Shareholders could not knowingly waive their right to assert dissenters' rights in the manner contemplated by § 35-1-830, MCA. The District Court's conclusion that § 35-1-830(1)(b), MCA, barred the Minority Shareholders from asserting dissenters' rights, in light of their failure to expressly object to Peter's actions, is incorrect as a matter of law. We determine that the Minority Shareholders were entitled to statutory notice of dissenters' rights pursuant to § 35-1-831, MCA.

II

¶30  2) Did the District Court err in concluding that the Minority Shareholders were barred from asserting dissenters' rights pursuant to the doctrines of waiver and equitable estoppel?

¶31  The District Court found that "[b]ecause of the disclosures and other findings . . . the objection of Jennifer and Frances to the exchange, as asserted in their exercise of dissenters' rights, is a fact which was either known by them or which can necessarily be imputed to them to have existed prior to the exchange." However, waiver is the voluntary, intentional relinquishment of a known right, which will be declared only when the party clearly manifests such an intention. McGregor v. Mommer (1986), 220 Mont. 98, 110, 714 P.2d 536, 543. The presence of voluntariness and the requisite intent are necessarily questions of fact. McGregor, 714 P.2d at 544.

¶32  The District Court found that the Minority Shareholders knew of their objection to the exchange and thus their failure to expressly object resulted in waiver. We disagree. Before the exchange took place, Jennifer stated that she did not want an interest in a ranch other than the family homestead. More importantly, we determined above that the Minority Shareholders were entitled to notice of the sale and of their right to dissent under the Montana Business Corporation Act. In the absence of a notice of sale and right to dissent, it cannot be said that the Minority Shareholders knowingly and voluntarily waived their rights. Finally, the Minority Shareholders did not clearly manifest an intent to waive their right to dissent. The District Court erred in concluding that, as a result of their silence, the Minority Shareholders waived their right to dissent.

¶33  In order to assert equitable estoppel as a defense, Peter must establish the following essential elements:

(1) there must be conduct, acts, language, or silence amounting to a representation or concealment of material facts; (2) these facts must be known to the party estopped at the time of his

conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under the circumstances that it is both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party, and thus relying, he must be led to act upon it, and (6) he must in fact act upon it in such manner as to change his position for the worse.

Dagel v. City of Great Falls (1991), 250 Mont. 224, 234-35, 819 P.2d 186, 192-93. We have held that 26-1-601, MCA, must be considered when analyzing equitable estoppel. Section 26-1-601 provides a list of conclusive presumptions and includes:

(1) the truth of a declaration, act, or omission of a party, as against that party in any litigation arising out of such declaration, act, or omission, whenever he has, by such declaration, act, or omission, intentionally led another to believe a particular thing true and to act upon such belief[.]

We further explained in Dagel that " '[e]stoppel is a principle of equity . . . equity will grant relief sought when in view of all the circumstances to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition . . . . Estoppel is not favored and will only be sustained upon clear and convincing evidence . . . .' " Dagel, 819 P.2d at 193 (quoting Kenneth D. Collins Agency v. Hagerott (1984), 211 Mont. 303, 310, 684 P.2d 487, 490).

¶34 The District Court concluded that the conduct, acts, language and silence of Jennifer and Frances amounted to representations of approval of the exchange and concealment of objection. These representations of approval rather than objection are a material fact. In completing the exchange, 75 Ranch and Peter relied upon the conduct, acts, language and silence of Jennifer and Frances. Because of this reliance, their position has changed for the worse. In short, the District Court concluded that the Minority Shareholders, by failing to expressly object to the exchange by the Corporation, waived their right to dissent and should be estopped from asserting dissenters' rights.

¶35 However, we have held that "estoppel 'has no application where the omissions of the party claiming estoppel brought about the problem.' " McGregor, 714 P.2d at 544 (quoting Carroccia v. Todd (1980), 189 Mont. 172, 177-78, 615 P.2d 225, 228; First Sec. Bank of Bozeman v. Goddard (1979), 181 Mont. 407, 593 P.2d 1040). We determine that Peter's failure to provide the Minority Shareholders with notice of the proposed exchange and an opportunity to dissent prevents Peter from claiming estoppel as it was his omission that gave rise to Jennifer and Frances' silence. We hold that the District Court erred in concluding that the Minority Shareholders were barred from asserting dissenters' rights pursuant to the doctrines of waiver and

equitable estoppel.

III

¶36  3) Did the District Court err in valuing the shares at "fair market value" in accordance with the Stockholders' Agreement?

¶37  4) Did the District Court err in concluding that a minority discount should be applied to the value of the shares?

¶38  The District Court, concluding that the rights, status, and legal relationship of the parties is determined by contract, namely the Stockholders' Agreement, held that the express written terms of the Stockholders' Agreement set the purchase price for the shares at "fair market value."  The court further determined that, based on McCann Ranch and In re Marriage of Jorgenson (1979), 180 Mont. 294, 590 P.2d 606, the application of a minority discount is allowed when determining "fair market value" under a Stockholders' Agreement.  However, in McCann Ranch, the shareholder did not assert dissenters' rights or institute proceedings to challenge McCann Ranch's failure to notify her of dissenters' rights.  The action was instituted by the corporation solely for the purpose of establishing the value of her stock.  McCann Ranch, 915 P.2d at 242.  In addition, the district court in McCann Ranch found that a minority discount was appropriate based on the methodology recommended by the shareholder's expert.  McCann Ranch, 915 P.2d at 243.  Furthermore, Marriage of Jorgenson is distinguishable in that this Court was presented with the issue of fairness of a property distribution in a dissolution of marriage.  The minority discount in  Marriage of Jorgenson was applied to the market value of the shares in accordance with a shareholders' agreement, not as a result of a transaction giving rise to dissenters' rights.  Marriage of Jorgenson, 590 P.2d at 610.

¶39  The Minority Shareholders in this case requested relief pursuant to the dissenters' rights provisions of the Montana Business Corporation Act. Section 35-1-827(1)(c), MCA, states that "[a] shareholder is entitled to dissent from and obtain payment of the fair value of the shareholder's shares in the event of . . . consummation of a sale or exchange of all or substantially all of the property of the corporation other than in the regular course of business . . . ."  Section 35-1-826(4), MCA, defines "fair value" with respect to dissenters' shares as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects . . . ." Because we have determined that the Montana Business Corporation Act controls, we further conclude that the Minority Shareholders are entitled to "fair value" in accordance with the statutes, rather than "fair market value" as provided in the Stockholders' Agreement.

¶40  In McCann Ranch, we held that nothing in § 35-1-826(4), MCA, prohibits consideration of a minority shareholder's lack of control and lack of marketability for minority shares when establishing "fair value."   McCann Ranch, 915 P.2d at 242-43.  We further reasoned that "[a] discount for a minority interest is appropriate when the minority shareholder has no ability to control salaries, dividends, profit distributions and day-to-day corporate operations."  McCann Ranch, 915 P.2d at 243 (citations omitted).  However,

the majority of courts addressing the issue of minority discounts has held that discounts should not be taken when determining fair value of minority shares

sold to another shareholder or to the corporation. See John J. Oitzinger, Fair Price and Fair Play Under the Montana Business Corporation Act, 58 Mont. L. Rev. 407, 420 n.82 (1997). These courts clarify that discounts at the shareholder level are inherently unfair to the minority shareholder who did not pick the timing of the transaction and is not in the position of a willing seller. Thus, these courts hold that a dissenting shareholder's position should be the equivalent of what it would have been had the fundamental change not occurred. Moreover, they reason that valuing the shares at less than their proportionate share of the corporation's fair value produces a transfer of wealth from the minority shareholder to the shareholders in control. Oitzinger, 58 Mont. L. Rev. 420-21 (citing In re McLoon Oil Co. (Me. 1989), 565 A.2d 997, 1005). We find the policies expressed by these courts compelling and therefore overrule our decision in McCann Ranch to the extent that it holds that a minority discount is appropriate when calculating "fair value" for the sale of a minority shareholder's shares in a closely-held corporation to a majority shareholder or to the corporation.

¶41  Applying a discount is inappropriate when the shareholder is selling her shares to a majority shareholder or to the corporation. The sale differs from a sale to a third party and, thus, different interests must be recognized. When selling to a third party, the value of the shares is either the same as or less than it was in the hands of the transferor because the third party gains no right to control or manage the corporation. However, a sale to a majority shareholder or to the corporation simply consolidates or increases the interests of those already in control. Therefore, requiring the application of a minority discount when selling to an "insider" would result in a windfall to the transferee. This is particularly true since the transferring shareholder would expect that the shares would have at least the same value in her hands as in the hands of the transferee. See Steven C. Bahls, Resolving Shareholder Dissention: Selection of the Appropriate Equitable Remedy, J. Corp. L. 285, 302 (Winter 1990). In short, "a minority discount recognizes that controlling shares are worth more in the market than are noncontrolling shares. . . ." Shear v. Gabovich (Mass. App. Ct. 1997), 685 N.E.2d 1168, 1187 (citation omitted). Since there is no "market" involved in an inside transfer of shares, the minority discount should not be applied.

¶42  Moreover, we recognize that the dissenters' rights provisions of the Model Business Corporation Act, as adopted by the Montana legislature, were fashioned as a legislative remedy for minority shareholders who find their interests threatened by significant corporate changes. See 3 Model Bus. Corp. Act § 13.01 at 13-8 (discussing the historical background of dissenters' rights). The dissenters' rights provisions protect the minority shareholders by allowing them to obtain payment of fair value for their shares. Based on this policy, many courts realize that applying discounts when valuing the shares of a dissenting shareholder destroys the legislative intent to protect the minority shareholder's right to dissent. MT Properties, Inc. v. CMC Real Estate Corp. (Minn. App. 1992), 481 N.W.2d 383, 387 (noting that courts in Delaware, Rhode Island, Iowa, Missouri, Maine, California, Colorado and Oregon are

among those rejecting minority discounts for the reason that discounts defeat legislation enacted to protect the minority's right to dissent); see also Charland v. Country View Golf Club, Inc. (R.I. 1991), 588 A.2d 609; Christopher Vaeth, Annotation, Propriety of Applying Minority Discount to Value of Shares Purchased by Corporation or its Shareholders from Minority Shareholders, 13 A.L.R. 5th 840 (1993).

¶43  We conclude that the Minority Shareholders are entitled to fair value pursuant to § 35-1-827, MCA.  Fair value means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects.  Section 35-1-826(4), MCA.  We further conclude that application of a minority discount is inappropriate when minority shareholders in a close corporation sell their shares to the corporation or majority shareholders in a situation controlled by the dissenters' rights statute.  We hold that the District Court erred in concluding that a discount applied to the minority shares.  We remand to the District Court for a valuation of the shares' fair value without the application of a minority discount.

¶44  Further, since we hold that the Montana Business Corporation Act controls, we direct the District Court to reconsider the Minority Shareholders' request for appointment of an appraiser pursuant to § 35-1-838, MCA.  That provision allows the District Court to appoint one or more appraisers to receive evidence and recommend a decision on the question of fair value. Section 35-1-838(4), MCA.

                    IV

¶45  5) Did the District Court err in adopting the valuation of the Majority Shareholder's expert which included a tax discount?

¶46  As courts have noted, the determination of "fair value" is an "inexact science" and its application has generated a large, disparate body of case law. See Kaiser v. Kaiser (N.D. 1996), 555 N.W.2d 585, 587; Robblee v. Robblee (Wash. 1992), 841 P.2d 1289.  We note that most courts, in valuing the shares of a dissenting shareholder based on fair value, recognize three approaches: asset value, market value and earnings value.  Asset value concentrates on the real worth of the corporate assets and can be determined by valuing the corporation upon a liquidation or by valuing the corporation as a going concern.  Market value refers to valuation of the shares on the basis of the price for which a willing buyer would pay a willing seller.  Earnings value relates to the earning capacity of the corporation and is usually arrived at by averaging earnings over a number of years.  Brown v. Hedahl's-Q B & R, Inc. (N.D. 1971), 185 N.W.2d 249; see generally Ferdinand S. Tinio, Annotation, Valuation of Stock of Dissenting Stockholders in Case of Consolidation or Merger of Corporation, Sale of its Assets, or the Like, 48 A.L.R. 3d 430 (1973 & Supp. 1997).  On remand, we note that courts have discretion to consider a number of factors including, but not limited to, the methods of valuation explained above.

¶47  The District Court was presented with two experts regarding the value of the Minority Shareholders' shares.  The Minority Shareholders' expert, Watts, appears to have advocated the earnings value method of valuation.  On

the other hand, Gilbert, expert for Peter and the Corporation, advocated the liquidation method of assessing asset value. The District Court determined that the evidence most credible in establishing "fair market value" was the testimony of Gilbert. On appeal, Peter asserts that "[a] sale, as contemplated under the asset approach, gives rise to a tax liability. . . ." However, courts have noted that unless the corporation is undergoing an actual liquidation, the liquidation method is not an appropriate method of valuing shares of a dissenting shareholder. See Cede & Co. v. Technicolor, Inc. (Del. 1996), 684 A.2d 289 (failure to value the company as a going concern may result in an understatement of fair value); Friedman v. Beway Realty Corp. (N.Y. 1995), 661 N.E.2d 972 (the fair value of a dissenter's shares is to be determined on their worth in a going concern, not in liquidation); Rapid-American Corp. v. Harris (Del. 1992), 603 A.2d 796 (it is axiomatic that in a statutory appraisal proceeding, the dissenting shareholders are entitled to receive fair value representing their proportionate interest in a going concern); Elk Yarn Mills v. 514 Shares of Common Stock (Tenn. 1987), 742 S.W.2d 638 (holding that the corporation is a going concern and the dissenting shareholders are entitled to a valuation of their shares on that basis and noting that the overwhelming weight of authority approves the valuation of the assets of the corporation as a going concern). Specifically, the Supreme Court of Delaware has explained that "the dissenter in an appraisal action is entitled to receive a proportionate share of fair value in the going concern on the date of the [action giving rise to dissenters' rights], rather than value that is determined on a liquidated basis." Cede & Co., 684 A.2d at 298 (citations omitted).

¶48 On remand, the District Court must determine "fair value" as opposed to "fair market value." In deciding whether to assess costs of the exchange or apply a tax discount in the "fair value" analysis, the court must bear in mind that "fair value," as explained above, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects. Thus, if costs are incurred after effectuation of the exchange, those costs should not be assessed against the dissenting shareholders. Likewise, as to applying a tax discount, in cases arising under appraisal statutes, courts have recognized that "ordinarily when dissenting stock is accorded net asset value, that value is to be determined by considering the corporation as a going concern and not as if it is undergoing liquidation." Tinio, 48 A.L.R. 3d at 465.

¶49 Because we determine that the Minority Shareholders are entitled to "fair value" pursuant to the dissenters' rights statute, we do not reach the issue of whether the Majority Shareholder acted in an oppressive manner that breached fiduciary duties which could entitle the Minority Shareholders to fair value pursuant to §§ 35-9-501 and -503, MCA. In addition, we leave to the District Court the determination of whether to assess court costs and attorney fees pursuant to § 35-1-839, MCA. We reverse and remand to the District Court for a determination of the "fair value" of the Minority Shareholders' shares and other relevant matters in accordance with this opinion.

/S/ W. WILLIAM LEAPHART

We concur:

/S/   J. A.   TURNAGE
/S/   JAMES C. NELSON
/S/   KARLA M. GRAY
/S/   WILLIAM E. HUNT, SR.
/S/   JIM REGNIER
/S/   TERRY N. TRIEWEILER