### In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.

[725 A.2d 927]

No. 97-175

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed January 15, 1999

Motion for Reargument Denied February 18, 1999

*Peter F. Langrock* of *Langrock Sperry & Wool,* Middlebury, and *Averill Laundon* of *Darby, Laundon, Stearns, Thorndike & Kolter,* Waterbury, for Appellants.

*Donald J. Rendall, Jr.* of *Sheehey, Brue, Gray & Furlong, P.C.,* Burlington, for Appellees.

**Johnson, J.** This is a dissenters' rights case in which Trapp Family Lodge, Inc., (TFL) appeals from a decision of the Lamoille County Superior Court that determined the fair value of the corporation's stock to be $63.44 per share. TFL argues that the trial court erred by (1) rejecting the testimony of its expert witness and adopting the valuation of the dissenting shareholders' expert in its entirety; (2) failing to consider the tax consequences of a hypothetical sale of corporate assets; (3) refusing to give weight to share valuations adopted for the purpose of a shareholders' agreement; and (4) applying a thirty-percent control premium. We affirm.

The facts as found by the trial court are as follows. TFL was incorporated in Vermont in 1962 as a holding company for certain

assets of the von Trapp family. TFL's assets include the Trapp Family Lodge, located in Stowe, Vermont. The Trapp Family Lodge is a resort hotel complex consisting of a hotel, two residential dwellings, and a cross-country skiing complex, all located on approximately 100 acres of land. In addition to the lodge facility, TFL owns approximately 2,200 acres of additional land. At the time of the merger that spawned this dispute, in January 1995, TFL also owned a timeshare facility known as the Trapp Family Guest Houses. Timeshare unit owners had exercised an option to purchase part of this facility, and the remaining $4,517,000 was payable to TFL in June 1995. Finally, TFL owns some royalty rights from which it receives annual income. As of the date of the merger, TFL's long term debt totaled approximately $6,430,700.

In September 1994, TFL gave notice to its shareholders of a special meeting to be held to consider a proposed merger of TFL into a new corporation. Prior to the meeting, TFL received notice from the dissenting shareholders indicating their intent to vote against the merger and to demand the payment of fair value for their shares. The merger was duly approved by the shareholders on October 17, 1994 at the special meeting. Prior to December 1, 1994, the dissenting shareholders, holding 75,629 of the corporation's 198,000 outstanding shares, tendered their shares and submitted forms demanding payment for them.

On January 28, 1995, TFL notified the dissenting shareholders that the merger had been completed, and paid the dissenting shareholders $33.84 per share, which the TFL board of directors estimated to be the fair value of each share based on a valuation completed by its expert Arthur Haut. On February 24, 1995, the dissenting shareholders filed demands with TFL for additional payments for their shares, claiming each share to be worth $61.00. On March 31, 1995, TFL commenced this action under 11A V.S.A. § 13.30 to determine the fair value of its stock as of the date of the merger.

The trial court concluded that the dissenting shareholders had complied with all statutory requirements necessary to entitle them to receive fair value for their shares. The court fixed the per share value of TFL on January 28, 1995, the date of merger, at $63.44 based on a valuation by the dissenters' expert Howard Gordon. TFL appeals, arguing that the court erred in determining the fair value of TFL shares.

Vermont's Business Corporation Act was amended effective January 1, 1994. See 11A V.S.A. §§ 1.01-20.16; 1993, No. 85, § 7. This case

brings the new dissenters' rights chapter of this Act before us for the first time. See 11A V.S.A. §§ 13.01-13.31. Under the new statute, a shareholder of a Vermont corporation who dissents from certain enumerated corporate actions, including consummation of a plan of merger, is entitled to obtain from the corporation payment of the "fair value" of his or her shares. See 11A V.S.A. § 13.02(a)(1). Section 13.01(3) defines "fair value" to mean "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." See *id.* § 13.01(3). This definition mirrors the definition of "fair value" in the Model Business Corporation Act. See Model Bus. Corp. Act § 13.01 (1978). The official comment to the Model Act indicates that this broad definition "leaves untouched the accumulated case law" on the various methods of determining fair value. Model Bus. Corp. Act § 13.01 cmt. (3).

Dissenters' rights statutes were enacted in response to the common-law rule that required unanimous consent from shareholders to make fundamental changes in a corporation. See *Hansen v. 75 Ranch Co.*, 957 P.2d 32, 37 (Mont. 1998). Under this rule, minority shareholders could block corporate change by refusing to cooperate in hopes of establishing a nuisance value for their shares. See *id.*; see also Model Bus. Corp. Act, ch. 13, Intro. Cmt. (minority demands could be motivated by hope of nuisance settlement). In response, legislatures enacted statutes authorizing corporate changes by majority vote. See *Hansen*, 957 P.2d at 37. To protect the interests of minority shareholders, the statutes generally permitted a dissenting minority to recover the appraised value of its shares. See *id.* Most recent statutes allow dissenting shareholders to demand that the corporation buy back shares at fair value. See *id.*

The basic concept of fair value under a dissenters' rights statute is that the stockholder is entitled to be paid for his or her "proportionate interest in a going concern." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983); accord *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1004 (Me. 1989); *Freidman v. Beway Realty Corp.*, 661 N.E.2d 972, 976 (N.Y. 1995). The focus of the valuation "is not the stock as a commodity, but rather the stock as it represents a proportionate part of the enterprise as a whole." *McLoon Oil*, 565 A.2d at 1004. Thus, to find fair value, the trial court must determine the best price a single buyer could reasonably be expected to pay for the corporation as an entirety and prorate this

value equally among all shares of its common stock. See *id*. Under this method, all shares of the corporation have the same fair value. See *id*.

A dissenting shareholder is not in the position of a willing seller, however, and thus, courts have held that fair value cannot be equated with "fair market value." See, e.g., *McLoon Oil*, 565 A.2d at 1005; *Hansen*, 957 P.2d at 41. Accordingly, methods of stock valuation used in tax, probate or divorce cases to determine fair market value are inapposite to the determination of "fair value" under the dissenters' rights statute. See *McLoon Oil*, 565 A.2d at 1004 (stock valuation method used in tax and probate cases not applicable); *Hansen*, 957 P.2d at 40 (fair market valuation for purposes of property distribution in marriage distinguishable from fair value for purposes of dissenters' rights). A shareholder who disapproves of a proposed merger gives up the right of veto in exchange for the right to be bought out at "fair value," not at market value. See *Hansen*, 957 P.2d at 41.

Finally, a fair-value determination is "necessarily a fact-specific process." *McLoon Oil*, 565 A.2d at 1003; accord *Bogosian v. Woloohojian*, 882 F. Supp. 258, 261 (D.R.I. 1995). "[T]he weight to be given to particular evidence is a matter within the sound discretion of the trial court." *Waller v. American Int'l Distrib. Corp.*, 167 Vt. 388, 394, 706 A.2d 460, 463 (1997); see also *Chokel v. First Nat'l Supermarkets, Inc.*, 660 N.E.2d 644, 650 (Mass. 1996) (valuation of dissenting shareholder's stock is question of fact within discretion of trial judge). Moreover, the trial court's findings of fact will not be set aside unless clearly erroneous. See V.R.C.P. 52(a). We now address TFL's arguments in turn.

## I.

TFL first argues that the trial court's valuation was clearly erroneous because it relied on the testimony of the dissenters' expert, Gordon, and rejected the testimony of TFL's expert, Haut. Although we do not find it necessary to detail the valuations by each expert to address the legal issues presented, an overview of the two approaches provides some context for our discussion. The dissenters' expert, Gordon, a certified financial analyst, conducted his appraisal using a net-asset-value approach; he used different methods to arrive at the values for individual assets, which were the lodge, the guest house option, the other guest house subsidiary assets, the royalties, and the excess land. Gordon used two methods to determine the value of the

lodge. First, he used a discounted-cash-flow method; the value of the lodge added to the value of TFL's other assets resulted in a share value of $64.00. Second, Gordon recalculated the net assets value using a prior real estate appraisal by Frank Bredice for the lodge; the Bredice value of the lodge added to the other TFL assets resulted in a share value of $62.67. Averaging these results, Gordon determined that the fair value of TFL was $63.44 per share.

TFL's expert, Haut, a certified public accountant, separated TFL's assets into three separate groups: the lodge facility and related operations, the excess land, and the guest house option. He used a capitalized-cash-flow method to value the lodge facility, relied upon the Bredice appraisal to determine the value of the excess land, and valued the guest house option by discounting the option price to a present value. Using these methods, Haut valued TFL in its entirety at $6,700,000, which yields a per share value of $33.84.

The trial court held that the fair value of TFL was $63.44 per share, as established by Gordon. The court rejected Haut's appraisal for several reasons, including (1) Haut's valuation lacked the thoroughness and credibility of Gordon's valuation and the Bredice appraisal, (2) Haut unreasonably assumed TFL's earnings would not grow, (3) Haut valued the lodge operations at $7,300,00 in 1992, $7,000,000 in 1993, but then at only $4,748,000 for 1994, and (4) Haut overstated income taxes reducing after-tax cashflows.

On appeal, TFL argues that the court erred by adopting one expert's valuation wholesale and completely rejecting the valuations of the other experts. TFL relies on *Gonsalves v. Straight Arrow Publishers, Inc.*, 701 A.2d 357, 362 (Del. 1997), which reversed the trial court's fair-value determination because the court had relied upon the valuation of one expert to the total exclusion of the valuation by the other expert. *Gonsalves* is distinguishable for two reasons. First, in *Gonsalves*, the court was presented with two widely divergent values: $1,059.37 and $131.60 per share. Here, the evidence included Gordon's lodge valuation ($9,355,000) and the Bredice lodge appraisal ($9,982,000), which was remarkably close to Gordon's valuation. On the other hand, Haut's valuation ($4,748,000) differed significantly from Gordon's valuation, the Bredice appraisal and even Haut's valuations for the two previous years ($7,300,000 in 1992 and $7,000,000 in 1993). Thus, the court here was not faced with the either-or evidence the court faced in *Gonsalves*. Second, essential to the court's reversal in *Gonsalves* was that the trial court had announced prior to trial that it intended to choose one expert's

valuation in total. The Supreme Court of Delaware concluded that the court's either-or approach conflicted with its statutory obligation to engage in an independent valuation. See *id.* at 361-62. Here, there was no pretrial decision to adopt such an approach.

TFL presents five specific reasons why Gordon's valuation was unreliable. First, TFL claims that the court abused its discretion by adopting Gordon's discounted-cash-flow-valuation method because it is highly speculative as it is based on future financial performance rather than historical financial data. Under the dissenters' rights statute, however, a valuation may be based on any method generally considered acceptable in the financial community and otherwise admissible in court. See *McLoon,* 565 A.2d at 1003; *Weinberger,* 457 A.2d at 713. Here, three experts testified that the discounted-cash-flow-valuation method was considered acceptable in the financial community; thus, the court's decision to accept this method of valuation for the lodge operations was within its discretion. See *Waller,* 167 Vt. at 394, 706 A.2d at 463 (weight to be given to particular method of valuation is within sound discretion of court); see also *In re Radiology Assocs., Inc.,* 611 A.2d 485, 490 (Del. Ch. 1991) (Delaware courts have affirmed validity of discounted-cash-flow method of valuation repeatedly). And contrary to TFL's claim, the court did not rely exclusively on the discounted-cash-flow method of valuation. Gordon's valuation of the lodge operations was based on averaging his discounted-cash-flow valuation of $9,355,000 and Bredice's fair-market-value appraisal of $9,982,000. The latter value was also comparable to national hotel industry sales data.

Second, TFL maintains that the trial court erred by adopting Gordon's three-percent growth rate because it was not supported by credible evidence and was not reasonable. The three-percent growth rate was supported by (1) TFL's comptroller's testimony that TFL's revenue increased three and one-half percent from 1993 to 1994, (2) a memorandum from TFL management to stockholders prior to the merger projecting substantial growth in the future, (3) a report submitted to shareholders with the memorandum indicating an expected growth rate of four percent for 1994 and further improvement expected based on national trends for 1995, and (4) Gordon's analysis of historical and projected revenue rates for the lodge and national hotel industry statistics. Based on this evidence, the court found that a three-percent growth rate was reasonable. We agree. See *Rubin v. Sterling Enterprises, Inc.,* 164 Vt. 582, 588, 674 A.2d 782, 786 (1996) (factual findings will be upheld on appeal unless there is no credible evidence to support finding).

Third, TFL argues that the evidence does not support Gordon's use of a discount rate of 8.6 percent. TFL relies primarily on material submitted to this Court with its brief in appendix IV. The dissenters have moved to strike the appendix on the ground that the material contained therein was not admitted into evidence before the trial court and, therefore, is not part of the record. We agree and strike appendix IV. See V.R.A.P. 10(a); *State v. Brown*, 165 Vt. 79, 82, 676 A.2d 350, 352 (1996) (documents not on file in trial court cannot be part of record on appeal). The record indicates that the 8.6 percent discount rate was derived from methods generally accepted in the financial community for valuing businesses. Moreover, despite TFL's claims that Gordon's discount rate was inappropriately low, the evidence indicated that Gordon's discount rate did not differ significantly from Haut's capitalization rate. Most of the difference in their lodge valuations stemmed from Haut applying a zero growth rate and failing to account for depreciation in a generally accepted method.

Fourth, TFL maintains that the court's reliance on the Bredice appraisal was clearly erroneous because the court rejected the capitalized-cash-flow method used by Haut, but accepted the Bredice appraisal using the same method. Gordon explained, however, his limited use of the Bredice appraisal. According to Gordon, if the liquidation value of the business is greater than the operating value, then the liquidation value should prevail. Consequently, Gordon reviewed the Bredice real estate appraisal, determined that it was reliable, and considered it as the lodge liquidation value against which he could check his operation value. Because the two values were so close, he gave equal weight to each by averaging the two values. Haut, on the other hand, used a valuation method that the court found less appropriate than Gordon's method, but more importantly, the court found that Haut did not use the method accurately. There was no error in using a valid real estate appraisal as a check on the discount-cash-flow-method valuation, while rejecting a valuation made solely on an inaccurate and unreasonable application of the capitalized-cash-flow method.

Fifth, TFL contends that the trial court erred by accepting Gordon's valuation and expense adjustments. The court found that Gordon eliminated extraordinary, nonrecurring expenses from his calculation, which is a generally-accepted adjustment for business valuation. This finding is supported by the record. See *Waller*, 167 Vt. at 395, 706 A.2d at 464 (recognizing that adjustments to income statement are often necessary to show an accurate profit picture).

Indeed, Haut also made some adjustments to the income statements, such as adding back payments made to family members. TFL has submitted a list of other alleged errors made by Gordon. Although referencing Gordon's testimony in the record, TFL provides no support for most of its claims that the statements were erroneous. The court made an adjustment for the single error that was acknowledged by Gordon. To the extent that the other statements to which TFL objects reflected on Gordon's credibility, the trial court was in the better position to make this evaluation. See *Bruntaeger v. Zeller*, 147 Vt. 247, 252, 515 A.2d 123, 126 (1986) (it is province of trial court to determine credibility of witnesses and weigh persuasive effect of evidence).

■ We conclude, therefore, that the trial court's finding setting the fair value of TFL's stock at $63.44 is supported by the evidence and is not clearly erroneous.

## II.

TFL next contends that the court erred as a matter of law by failing to consider the tax consequences of a potential sale. According to TFL, a potential buyer of a corporation would consider the potential tax consequences of the purchase, and therefore, the trial court should have considered the tax consequences of a liquidation of the corporation's assets. TFL points to appendices I, II and III submitted in support of its brief to illustrate the tax consequences of a sale of TFL assets. The dissenters move to strike the appendices because these documents were not admitted into evidence at trial. We do not consider the appendices on appeal because we conclude that the trial court correctly determined that no tax consequences of a sale of corporate assets should be considered where no such sale is contemplated.

■ Under the dissenters' rights statute, the court is required to value the corporation as "a going concern." *Weinberger*, 457 A.2d at 713. Accordingly, courts have generally rejected any tax discount "unless the corporation is undergoing an actual liquidation." *Hansen*, 957 P.2d at 42; see also *Bogosian v. Woloohojian*, 882 F. Supp. at 266 (only when corporation has committed to sale of assets may tax impact, if any, be considered). Here, there was no evidence that TFL was undergoing liquidation on the valuation date. Indeed, the evidence indicated that TFL was a going concern. Thus, the trial court correctly declined to consider the tax consequences of the sale of any assets.

TFL maintains that it will have to sell assets in order to pay the dissenters for their shares, and that therefore the tax consequences of the sale should be considered in the valuation. Under the dissenters' rights statute, however, the dissenters are entitled to a pro rata share of the fair value of the corporation immediately before the merger. See 11A V.S.A. § 13.01(3) (value shares immediately before effectuation of corporate action to which dissenter objects). "Thus, if costs are incurred after effectuation of the exchange, those costs should not be assessed against the dissenting shareholders." *Hansen*, 957 P.2d at 43. Accordingly, it would be inappropriate to consider a future sale of assets to determine the fair value prior to merger. See *id.* (rejecting tax discount in fair value determination where corporation is not undergoing liquidation); see also *Bogosian v. Woloohojian Reality Corp.*, 973 F. Supp. 98, 107 (D.R.I. 1997) (rejecting similar tax-consequences argument by corporation because it would be inequitable to order dissenter to reimburse corporation for tax consequences of buy-out where dissenter undoubtedly would also face tax consequences).

## III.

TFL next contends that the trial court erred as a matter of law by refusing to consider certain "agreed values" determined pursuant to a shareholders' restriction agreement. Under the agreement, a shareholder who desired to transfer shares to anyone other than ascendants or lineal descendants was required to offer the shares first to TFL. If TFL declined to purchase them, then the shareholder was required to offer the shares to the remaining shareholders. The purchase price for the shares was determined by an "agreed value" established by the stockholders of at least seventy-five percent of the outstanding shares. In the absence of an "agreed value," the stock price was set by "book value" calculated pursuant to the procedures in the agreement. The agreed value under the stock restriction agreement for 1992 was $28.78 and for 1993 was $30.92. The trial court found that the agreed values were based upon the fair market value for minority interest shares and were not timely representations of the "fair value" of the shares in January 1995. TFL claims it was reversible error to accord no weight to the "agreed values."

In close corporations, "shareholders' agreements restricting the manner in which shareholders may dispose of their shares are quite common." *Hansen*, 957 P.2d at 37. Such an agreement does not apply,

however, to a fair value determination pursuant to the dissenters' rights statute unless the agreement so provides. See *id.* (rejecting shareholders' agreement in determining fair value because agreement did not contemplate a fundamental change in corporate form such as merger); see also *In re Pace Photographers, Ltd.*, 525 N.E.2d 713, 718 (N.Y. 1988) (fair value under minority buy-out statute not determined by shareholders' agreement concerning voluntary sale of stock). The shareholders' objective in establishing an agreed value for voluntary sale of shares may be very different than the court's objective in determining fair value in a dissenters' rights case. See *id.* at 719.

█ Similarly, the restriction agreement here is not applicable because it did not contemplate establishing share values for a corporate merger. Moreover, the agreed values for 1992 and 1993 were not indicative of the fair value in January 1995 because they were untimely in the sense that they were no longer in effect, and because they were based on fair market value of a minority interest. The court weighed these factors and was not persuaded that the agreed values provided any basis for the fair value in January 1995. It was within the court's discretion to determine the weight to be given any particular evidence. See *Waller*, 167 Vt. at 394, 706 A.2d at 463.

## IV.

TFL next argues that the trial court's application of a thirty-percent control premium was clearly erroneous. Gordon testified that, in applying the discounted-cash-flow-method to value the lodge, he relied on figures derived from publicly traded companies and that the per share value of a share on the public market is a minority interest value. Thus, even if this value is multiplied by the number of outstanding shares, the total reflects an accumulation of minority interests; it does not reflect the value of a controlling interest. A controlling interest is of greater value than a minority interest because the controlling shareholder has control over operation of the corporation. Because Gordon's valuation was based on publicly-traded minority interest values, he applied a control premium to account for the value of control in owning the lodge as a whole. For the same reason, Haut also applied a control premium in his valuation. Based on this evidence, the trial court applied a control premium in deciding fair value.

Under the circumstances presented here, there was no legal error in applying a control premium to adjust a valuation that reflected publicly traded minority interests. See *Rapid-American Corp. v. Harris*, 603 A.2d 796, 806 (Del. 1992) (reversing trial court's valuation for failing to apply a control premium where corporation had one hundred percent interest in three subsidiaries and valuation of subsidiaries was based on publicly traded value, which represented discounted minority values). TFL relies on appendices IV and V to contest application of a control premium. Again, this material was not admitted into evidence at trial, and thus, we do not consider it here on appeal. The expert testimony at trial supported the court's use of a control premium.

■ TFL further argues that even if a control premium is appropriate, there is no evidence in the record to support the trial court's finding that a thirty-percent premium is reasonable, if not somewhat conservative. Gordon testified, however, that the average control premium for the hotel and motel industry was forty-six percent. Haut applied a fifteen-percent control premium. Gordon applied a thirty-percent control premium and stated that this figure was on the conservative side. The court's findings are supported by the evidence. See *Wyatt v. Palmer*, 165 Vt. 600, 601, 683 A.2d 1353, 1356 (1996) (court's findings upheld if supported by reasonable evidentiary basis).

*Affirmed.*