985 F.2d 954
 UNITED STATES of America, For the Use and Benefit of CONNER
UNIVERSAL COMPANY, INC., a corporation, Plaintiff,
v.
DIMARCO CORPORATION; The Heritage Insurance Company of
America, in liquidation, Defendants.
The HERITAGE INSURANCE COMPANY OF AMERICA, in liquidation,
Third Party-Plaintiff-Appellee,
v.
DIMARCO CORPORATION; H. Richard Westerhold; Marjorie
Westerhold, Third Party-Defendants,
James W. McElroy, Third Party-Defendant-Appellant.
 No. 92-1148.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 18, 1992.
Decided Feb. 8, 1993.
 
 Peter Paul Fiore, Jr., St. Louis, MO, argued, for appellant.
 James A. Bingley, St. Louis, MO, argued (David M. Duree, on the brief), for appellee.
 Before JOHN R. GIBSON, BOWMAN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
 BOWMAN, Circuit Judge.
 
 
 1
 Third-party defendant James W. McElroy appeals from the District Court's grant of summary judgment to third-party plaintiff The Heritage Insurance Company of America (Heritage). The District Court adopted the report and recommendation of the magistrate judge to whom the matter was referred pursuant to 28 U.S.C. § 636(b) (1988).
 
 
 2
 The District Court's judgment awards Heritage damages against McElroy in the amount of $20,000 plus prejudgment interest from August 15, 1984, the basis for liability being McElroy's refusal to honor his high bid at an execution sale of property upon which Heritage had foreclosed. McElroy contends the District Court erred in: 1) finding him liable, inasmuch as Heritage did not take all the steps reasonably necessary to conduct a second sale of the property and did not mitigate its damages by reviving its statutory lien on the property; and 2) awarding prejudgment interest from August 15, 1984, since Heritage did not have a claim that was liquidated in amount until a much later date. We affirm the $20,000 award, reverse the award of prejudgment interest from August 15, 1984, and vacate the judgment and remand for entry of a new judgment reflecting the proper amount of prejudgment interest.
 
 I.
 
 3
 The magistrate judge's report contains a long and detailed statement of the procedural and factual history of this case. The following summary of the relevant history includes only as much detail as we believe is necessary to make our decision understandable.
 
 
 4
 In 1984, the District Court entered a money judgment for Heritage against Richard and Marjorie Westerhold. Seeking to collect on that judgment, Heritage obtained a judgment lien and an order directing the United States Marshals Service to hold an execution sale of a certain piece of real property owned by the Westerholds. The sale was held on August 15, 1984. McElroy's bid of $20,000 was the high bid at the sale, but after McElroy learned of certain encumbrances on the property[1] he refused to go through with the purchase. Later that same day, after learning that McElroy had declined to go forward with the purchase of the property, Heritage filed a motion to order the marshal to conduct a second sale and to hold McElroy liable for any deficiency between the amount received at the second sale and his original bid of $20,000. McElroy opposed this motion, contending that the marshal had rejected his bid.
 
 
 5
 While Heritage and McElroy squabbled over whether McElroy's bid had been accepted, the Westerholds filed a Chapter 11 petition in bankruptcy causing the automatic stay provisions of the Bankruptcy Code to go into effect, and a few days later a magistrate judge entered an order staying Heritage's collection efforts. Heritage filed numerous motions in the bankruptcy proceedings, and finally, on March 19, 1986, the bankruptcy court modified the automatic stay to allow Heritage to proceed with its claim against McElroy, but the stay continued to bar Heritage from conducting a second execution sale of the Westerholds' property.
 
 
 6
 Meanwhile, the District Court, without addressing the effect of the bankruptcy stay, denied Heritage's motion for a second sale of the property, holding that the marshal had refused McElroy's bid and that McElroy therefore was not liable as a defaulting purchaser under Missouri law. On appeal to this Court, we held that the District Court's finding that the marshal had refused McElroy's bid was clearly erroneous, and that McElroy's refusal to complete the sale made him liable for any deficiency resulting from a second execution sale. Accordingly, we reversed the order of the District Court and remanded the case for further proceedings. Heritage Ins. Co. of Am. v. McElroy, 807 F.2d 741 (8th Cir.1986). Like the District Court, we did not address any of the issues attendant to the bankruptcy proceedings.
 
 
 7
 The bankruptcy court continued to deny Heritage's motions for relief from the automatic stay to allow Heritage to conduct a second execution sale. Eventually, however, in February 1990, the bankruptcy court dismissed the Westerholds' bankruptcy petition; the Westerholds appealed from that ruling but in May 1990 voluntarily dismissed the appeal and their bankruptcy proceedings thus ended.
 
 
 8
 On July 7, 1990, without Heritage's knowledge, the Westerholds entered into a contract to sell the property in question to Stephen and Marianne Hollingsworth for $95,000. Chicago Title Insurance Company issued a commitment for title insurance on the property and noted, as exception number 12, the writ of execution previously filed by Heritage. After negotiations and modifications, the sale closed on October 2, 1990. The final sale price was $92,200. Normandy Bank held a first mortgage on the property. This mortgage had a balance of $56,676.95 at the time of closing; that balance had been only $30,000 at the time of the execution sale in 1984. First Missouri Bank held a second mortgage with a balance of over $70,000 at the time of closing; that balance had been under $40,000 at the time of the execution sale in 1984. Taxes and closing costs came off the top of the proceeds of the sale. The remaining portion of the proceeds was sufficient to pay Normandy Bank in full, but First Missouri Bank received only $25,296.44 on its second mortgage.
 
 
 9
 Chicago Title Insurance Company issued its title policy on October 5, 1990, in the amount of $95,000. The policy did not list the Heritage levy and execution as an exception, or in any other manner. The title company's attorneys provided an opinion that Heritage's lien, not having been reperfected, was no longer valid, so exception number 12 was deleted from the title insurance, and Heritage was not notified of the sale or closing.
 
 
 10
 In November 1990, after becoming aware of the sale to the Hollingsworths, which obviously precluded a second execution sale, Heritage filed a motion for summary judgment in the still-pending action in the District Court requesting that it be awarded $20,000 (the amount of McElroy's bid) plus interest from August 15, 1984. McElroy filed a motion in opposition to Heritage's motion that was treated as a cross-motion for summary judgment. The magistrate judge held a hearing on these motions. Undisputed evidence adduced at the hearing showed that the property had a market value in the $80,000-$85,000 range in July 1984 and in the $90,000-$100,000 range during the months leading up to the sale to the Hollingsworths in October 1990. Heritage's expert testified, without refutation, that the market value of the property never came even close to meeting the amount required--a sum that exceeded $120,000--to cover the combined balances of the two mortgages as of 1990 when the Westerholds came out of bankruptcy and sold the property to the Hollingsworths.
 
 II.
 
 11
 We review a grant of summary judgment de novo. United States ex rel. Glass v. Medtronic, Inc., 957 F.2d 605, 607 (8th Cir.1992). The standard we apply is the same as that applied by the trial court: whether the record shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 III.
 
 12
 Federal Rule of Civil Procedure 69(a) provides that absent any statute of the United States, proceedings in aid of execution "shall be in accordance with the practice and procedure of the state in which the district court is held." Here, the proceedings are governed by Missouri Revised Statutes section 513.240, which provides:
 
 
 13
 If the purchaser refuse to pay the amount bid for property struck off to him, the officer making the sale may again resell such property to the highest bidder, or he may resell it on a subsequent day, as though no previous sale had been made, and if any loss shall be occasioned thereby, the officer shall recover the amount of such loss, with costs, by motion, before any court.
 
 
 14
 Mo.Rev.Stat. § 513.240 (1986).
 
 
 15
 McElroy contends that because a second sale has become impossible there can be no deficiency for which he is liable. McElroy also argues that Heritage could have conducted a second sale before the Westerholds declared bankruptcy, and that he has been unfairly prejudiced by Heritage's delay. Heritage counters that it took all the steps reasonably necessary to effectuate a second sale after McElroy failed to honor his bid, but that the litigation arising from McElroy's contention that the marshal had refused his bid, combined with the automatic stay in the Westerholds' bankruptcy proceedings, precluded a second sale until those bankruptcy proceedings finally ended in May 1990. By that time, however, there was no equity left in the Westerholds' property because the balances of the outstanding first and second mortgages had grown and now substantially exceeded the value of the property; therefore no reasonable person would have bid on the property.
 
 
 16
 We agree with the District Court's conclusion that, as a matter of Missouri law, judgment can be obtained against the defaulting bidder in the full amount of his bid if, through no fault of the judgment creditor, a second sale of the property never occurs and finally becomes impossible. Normally, a second sale must take place before any deficiency may be obtained against a defaulting bidder, and this normal scenario is what section 513.240 contemplates. We believe, however, that the Missouri courts would apply this remedial statute in a flexible manner, allowing Heritage to recover from McElroy even though, through no fault of Heritage, a second sale never occurred and now never can occur.
 
 
 17
 Despite McElroy's contentions to the contrary, the following undisputed facts conclusively establish that Heritage took all the steps reasonably necessary to conduct a second sale, and that through no fault of Heritage its efforts were thwarted: 1) Heritage sought a court order for a second sale on the day that McElroy defaulted; 2) the granting of such an order was delayed by the litigation necessitated by McElroy's insistence that the marshal had refused his bid; 3) by the time that litigation was resolved favorably to Heritage, the Westerholds had filed their bankruptcy petition and Heritage was barred by the automatic stay from obtaining a second sale; and 4) years later, when the Westerholds' bankruptcy petition finally was dismissed and the automatic stay thus was lifted, the value of the property had become substantially less than the combined balances of the two prior mortgages, so that it would have been pointless to go through the motions of holding a second execution sale. In these circumstances, the defaulting bidder cannot be heard to complain about the absence of a second sale and is liable to the execution creditor for the execution creditor's damages, which can only be measured by the amount of the defaulted bid. We therefore conclude that McElroy is liable to Heritage for the full amount of his bid.
 
 
 18
 McElroy argues that Heritage failed to mitigate its damages by not reperfecting its judgment lien on the property. The District Court concluded that reperfection would have been futile since the combined balances of the two outstanding mortgages exceeded the value of the property, and because both mortgages had priority over Heritage's judgment lien. McElroy argues that this reasoning ignores the wonders of modern real estate financing. He posits that a canny investor would have bid on the property and then attempted to pay off the mortgages at less than face value. McElroy's argument, however, is entirely speculative, and we reject it. We note that when the property was sold to the Hollingsworths, the proceeds were insufficient to come even close to paying the combined balances of the two mortgages that were prior to Heritage's judgment lien. As a general proposition, we agree with McElroy that creditors should look out for their interests by maintaining perfected liens. In this case, however, Heritage's judgment lien on the Westerhold property had become worthless and, as a practical matter, to have reperfected the lien would have been an exercise in futility. We hold that McElroy is liable for the full amount of his bid despite Heritage's failure to reperfect its lien.
 
 IV.
 
 19
 We turn next to the question as to the date from which Heritage should have prejudgment interest on its recovery. The District Court awarded Heritage prejudgment interest from August 15, 1984, the date that McElroy defaulted on his bid. McElroy argues that this was error, and that he should be liable for prejudgment interest beginning only from the date of the magistrate judge's report and recommendation. Heritage would have us approve the beginning date selected by the District Court. We cannot accept either of these positions.
 
 
 20
 Under Missouri law, prejudgment interest ordinarily is denied if the claim is not liquidated because "where the person liable does not know the amount he owes he should not be considered in default because of failure to pay." Fohn v. Title Ins. Corp. of St. Louis, 529 S.W.2d 1, 5 (Mo.1975) (en banc). A claim is said to be liquidated when the claim is "fixed and determined," Schnucks Mkts., Inc. v. Cassilly, 724 S.W.2d 664, 668 (Mo.Ct.App.1987), but even if a claim is not strictly liquidated, prejudgment interest still may be awarded if the claim "is readily ascertainable by computation or by determination according to a recognized standard." Ehrle v. Bank Bldg. & Equip. Corp. of America, 530 S.W.2d 482, 496 (Mo.Ct.App.1975). Interest on a liquidated contract claim runs from the date the principal was due and demand was made. Burger v. Wood, 446 S.W.2d 436, 445 (Mo.Ct.App.1969). Furthermore, "where plaintiff's demand is liquidated, the interposition of an unliquidated counterclaim or set-off does not convert the liquidated demand into an unliquidated one or preclude plaintiff's recovery of prejudgment interest, even though such counterclaim or set-off puts the amount payable in doubt." Id. at 444.
 
 
 21
 The District Court correctly found that McElroy's liability to Heritage for any deficiency resulting from a second execution sale was determined by our opinion in Heritage, 807 F.2d 741. United States ex rel. Conner Universal Co. v. Dimarco Corp., No. 83-1417 C (2), slip op. at 3 (E.D.Mo. Oct. 10, 1991). Because McElroy's liability to Heritage was thus established, the District Court concluded that the claim was liquidated as of the date of McElroy's bid "even if it is subject to setoff and even if the amount of ultimate liability is in doubt." Id. at 4 (citing Ohlendorf v. Feinstein, 670 S.W.2d 930, 935 (Mo.Ct.App.1984)). We disagree. The establishment as a legal proposition of McElroy's liability for any deficiency that might occur upon a second execution sale could not make Heritage's claim for the deficiency a liquidated claim until both the fact and the amount of the deficiency were known.
 
 
 22
 Our earlier opinion contemplated that a second sale would occur. Had there been a second sale, Heritage's claim would have been for any deficiency between McElroy's $20,000 bid and the winning bid at the second sale. Since a second sale was never feasible, through no fault of Heritage's, McElroy is, as we already have concluded, liable for the full amount of his bid. But until the possibility of a second sale finally was ruled out, Heritage's claim was only for the amount of any deficiency that might result from a second sale, and not for the full amount of McElroy's bid. Neither the fact nor the amount of the deficiency could be known until a second sale had been held. Thus, until it became clear that the second sale never could occur, Heritage's claim was neither liquidated nor readily ascertainable. Simply put, Heritage could not have demanded payment from McElroy as long as a second sale was still in the cards because it could not have known with certainty whether it would have a claim or, if it did, the amount of the claim. And when it finally became clear that the second sale never could occur, Heritage's claim for damages measured by any deficiency resulting from a second sale was superseded by its claim for damages measured by the full amount of McElroy's bid at the first sale.
 
 
 23
 We believe that this claim--Heritage's claim for damages in the amount of McElroy's bid, rather than the amount of any deficiency--became liquidated and subject to an award of prejudgment interest only as of the date a second sale became, in practical, marketplace terms, an impossibility. We deem that date to be the date there ceased to be any equity in the property, i.e., the date that the combined outstanding balances of the two mortgages on the property finally overtook its fair market value. From that date forward, a second execution sale was no longer a realistic possibility, and prejudgment interest should be assessed from that date.
 
 V.
 
 24
 In summary, we affirm the District Court's decision that McElroy is liable to Heritage for the full amount of his $20,000 bid. We hold, however, that although Heritage is entitled to prejudgment interest, the court erred in awarding prejudgment interest from the date of McElroy's default. We therefore vacate the judgment entered by the District Court and remand for the entry of a new judgment awarding prejudgment interest from the date the property that was the subject of the execution sale ceased to have any equity. That date may be determined by the court from the present record or, if the court deems it appropriate, with the aid of an evidentiary hearing.
 
 
 25
 The judgment is vacated and the case is remanded for the entry of a new judgment awarding prejudgment interest in an amount consistent with this opinion.
 
 
 
 [1]
 Heritage's judgment lien was secondary to two prior mortgages on the property, which, at the time of the execution sale, had balances due totaling approximately $65,000