# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 99-3114/3178/00-2234

_____

| | | |
|---|---|---|
| Thomas A. Swope, Judy N. Swope, | * | |
| Estate of O.W. Schneider, Jr., by | * | |
| and through personal representatives | * | |
| for the Estate of O.W. Schneider, | * | |
| Jr., Tracy Leigh Schneider Morris; | * | |
| O.W. Schneider, III; Kris Douglas | * | |
| Schneider; Melody Dawn Schneider; | * | |
| Mark William Schneider; Tracy | * | Appeals from the United States |
| Leigh Schneider Morris; O.W. | * | District Court for the |
| Schneider, III, | * | Eastern District of Missouri |
| | * | |
|     Appellees/Cross-Appellants, | * | |
| | * | |
|     v. | * | |
| | * | |
| Siegel-Robert, Inc., a Nevada | * | |
| Corporation, | * | |
| | * | |
|     Appellant/Cross-Appellee. | * | |

_____

Submitted:  June 12, 2000

Filed:   February 26, 2001

_____

Before WOLLMAN, Chief Judge, and McMILLIAN and BYE, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Siegel-Robert, Inc. (hereinafter "the Company"), a closely-held corporation headquartered in St. Louis, Missouri, appeals from a final order entered in the United States District Court[1] for the Eastern District of Missouri following a bench trial, holding that the Company's valuation of its minority shares did not reflect the "fair value" of the shares pursuant to Mo. Rev. Stat. § 351.455. Swope v. Siegel-Robert, Inc., 74 F. Supp. 2d 876 (E.D. Mo. June 23, 1999) (memorandum and order). For reversal, the Company argues the district court erred in (1) holding that no marketability discount applied to the "fair value" determination of the Company's shares and (2) failing to provide adequate reasons for its valuation determination. Appellees (minority shareholders) cross-appeal, contending that the district court erred in (1) failing to properly evaluate "fair value" by applying a minority discount rather than the "enterprise value" and (2) failing to apply Missouri's statutory prejudgment interest rate to the award. In a consolidated appeal, the Company claims that the district court abused its discretion by denying the Company's Rule 60(b) motion without conducting a hearing to consider newly discovered evidence. For the reasons discussed below, we affirm the orders of the district court in part, reverse in part and remand the case to the district court for further proceedings consistent with this opinion.

## Jurisdiction

Jurisdiction in the district court was proper based upon 28 U.S.C. § 1332. Jurisdiction on appeal is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a) .

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

## Background

The following facts are undisputed based on evidence introduced at trial. Bruce Robert formed the Company in 1946 as a part-time chrome-plating business. O.W. Schneider, Jr. worked for the Company for 40 years, helped build the Company through his technical expertise, and eventually acquired an ownership interest in the business, buying shares in the 1970s and 1980s. In the 1980s, the Company began to diversify by acquiring manufacturing companies with non-retail customers, and experienced substantial growth. The Company, now comprised of six units, has continued to grow through an aggressive acquisition policy. The district court determined that the growth of the Company is not likely to continue at its current rate absent the continuation of an aggressive acquisition policy, a factor unable to be reflected in the valuation of the Company. See Swope v. Siegel-Robert, Inc., 74 F. Supp. 2d 876, 900-01 (E.D. Mo. 1999).

Halvor B. Anderson became associated with the Company in August 1981. He gradually rose within the Company until he became its Chief Executive Operating Officer in October 1996. Anderson actively participates in the day-to-day management of each division and the Company as a whole.

On July 19, 1997, Anderson proposed a merger which would change the Company's corporate status to a Subchapter S election in an attempt to reduce corporate taxes. Under that arrangement, the Company could allocate income directly to the shareholders, who would pay the tax as individuals and shield the corporation from paying tax at the corporate level. Two days later, the Board of Directors voted to recommend the merger to the shareholders. That same day, Anderson mailed to the shareholders a notice of vote on the merger proposal. In order for a company to achieve and maintain Subchapter S status, it may not have more than 75 shareholders. At the time of the Board meeting, the Company had 63 shareholders: 40 were Robert family members and 23 were non-family members. Anderson explained that, while it

would have been possible to attain Subchapter S status without squeezing out the minority shareholders, the Company might then be at risk of re-opening the tax issue, because 100% of shareholders had to agree to the election. Anderson asserted that the merger action was taken to assure that the Subchapter S election could be made and preserved into the future without being repealed, even though he also admitted that the bylaws could have been amended to provide that no person could transfer their shares in violation of the Subchapter S election.

Anderson, a minority non-family shareholder, calculated a $20 share price to reflect the value of the shares held by minority shareholders as of the merger date. Prior to this decision, he did not consult the Board of Directors, an appraiser, an evaluation professional, an accountant, a member of senior management, or any family or non-family members, nor did he consider appointing a committee to determine a fair value or to explore whether there was a duty to protect the interests of minority shareholders. Anderson based his valuation of the stock on the following factors: no market existed for the stock, the shares had traditionally been sold at 65% of book value level, income from the shares projected to be lower in the following year, and the share price fell within the range of historical dividend figures. At the shareholders meeting, 15 of the 23 non-family members voted against the merger, five abstained or were not present, and three voted in favor of the merger, including Anderson and two other Company employees. The dissenting minority shareholders asked Anderson to reconsider the $20 share price and suggested that he hire an appraiser, which he declined to do.

The merger was approved on July 31, 1997, and Siegel-Robert, Inc., a Missouri corporation, merged with Siegel-Robert, Inc., a Nevada corporation (the surviving corporation). Eleven of the minority shareholders accepted the $20 per share as fair value for their stock. The others, including appellees, made a written demand on the Company for the "fair value" of their stock. When negotiations failed, appellees filed a "Complaint for Stock Appraisal" in the district court pursuant to Mo. Rev. Stat.

§ 351.455, requesting a determination of the "fair value" of their Siegel-Robert shares as of July 30, 1997, the day before the merger. The case proceeded to a bench trial in federal court, based upon diversity jurisdiction.

The district court, sitting without a jury, heard testimony for seven days, including many expert witnesses from both sides. All the experts agreed that there are three potential levels of valuation for stock in closely-held corporations: (1) "enterprise interest," which attempts to replicate the price that would be paid for the entire corporation by a third party; (2) "marketable minority interest," which accounts for the fact that the shares do not represent control of the company but assumes they are readily marketable; and (3) "non-marketable minority interest," which discounts for lack of control and also for lack of liquidity. The expert witnesses valued the Company according to these premises, and their valuations of the stock ranged from $98.40 per share to $30.00 per share. In addition, the Company submitted evidence that when O.W. Schneider, Jr. died in 1997, his estate valued his shares of Company stock at $18.50 per share for estate and inheritance tax purposes.

On June 23, 1999, the district court issued a Memorandum and Order which held that a minority discount was appropriate but that a lack of marketability discount was inappropriate, and valued the shares at $63.36 per share. The district court concluded that appellees were entitled to prejudgment interest and awarded simple interest at the rate of 5.115% per year, to reflect the 52-week T-Bill rate set forth in 28 U.S.C. § 1961 as the basic interest rate for money judgments on civil cases before district courts. The Company appealed, and the minority shareholders cross-appealed to dispute the application of the minority discount and the prejudgment interest rate selected by the district court. On April 17, 2000, the Company filed a Fed.R.Civ.P. 60(b) motion to consider a newly-received IRS report which independently valued the Company's majority stock for estate tax purposes at $45.69 per share. On May 12, 2000, the district court denied the Rule 60(b) motion. The Company moved to consolidate the

appeal of the Rule 60(b) denial and the original appeal. We agreed to consolidate the appeals and requested expedited briefing on the Rule 60(b) issue.

## Discussion

This case arises from appellees' proper exercise of their appraisal rights as dissenting shareholders under Mo. Rev. Stat. § 351.455,[2] seeking a determination of the fair value of their minority shares in the Company. Although the statute itself does not define fair value, Missouri law requires a district court to consider "every relevant fact and circumstance which enters into the value of the corporate property and which reflects itself in the worth of corporate stock." Dreiseszun v. FLM Indus., Inc., 577 S.W.2d 902, 907 (Mo. Ct. App. 1979) (Dreiseszun). The Missouri Supreme Court articulated its approach to determining fair value as "purposely if not wisely establish[ing] a flexible general standard for fixing value between parties who are either unable or unwilling to voluntarily agree . . . [T]here is no simple mathematical formula and each case presents its particular problem." Phelps v. Watson-Stillman Co., 293 S.W.2d 429, 433 (Mo. 1956). While § 351.455 does not specifically address how to determine fair value, the Missouri Appeals Court concluded that the determination of "fair value pursuant to § 351.455, when a shareholder of a corporation objects to a

---

[2] Mo. Rev. Stat. § 351.455(1) provides that:

If a shareholder of a corporation which is a party to a merger or consolidation shall file with such corporation, prior to or at the meeting of shareholders at which the plan of merger or consolidation is submitted to a vote, a written objection to such plan of merger or consolidation, and shall not vote in favor thereof, and such shareholder, within twenty days after the merger or consolidation is effected, shall make written demand on the surviving or new corporation for payment of the fair value of his shares as of the day prior to the date on which the vote was taken approving the merger or consolidation, the surviving or new corporation shall pay to such shareholder, upon surrender of his certificate or certificates representing said shares, the fair value thereof.

merger or consolidation, rests within the sound discretion of the trier of fact after every relevant fact and circumstance is considered." King v. F.T.J., Inc., 765 S.W.2d 301, 306 (Mo. Ct. App. 1988) (King). Moreover, while the ultimate determination of fair value is a question of fact, the determination of whether a given fact or circumstance is relevant to fair value under Mo. Rev. Stat. § 351.455 is a question of law which we review *de novo*. In the present case, the Company contends that the lack of control over minority shares and the absence of a liquid market are relevant circumstances which reduce the value of the stock, warranting not only a minority discount, but also a lack of marketability discount. On *de novo* review of these issues of law, we disagree.

Appeal No. 99-3114

I.    Application of Marketability Discount

The Company argues that the district court failed to consider all relevant facts and circumstances when it refused to consider the lack of liquidity of the stock, and that the district court erroneously failed to discount the stock for lack of marketability. We disagree.

The "fair value" appraisal statute, Mo. Rev. Stat. § 351.455, was enacted in response to the legislature's decision to change the requirements for shareholder approval of major corporate transactions by allowing majority rather than unanimous shareholder approval. In exchange, the legislature created appraisal rights to protect minority shareholders from being deprived of their ownership interests by majority shareholders. Hunter v. Mitek Indus., 721 F. Supp. 1102, 1106-07 (E.D. Mo. 1989) (Hunter) (concluding that the purpose of the fair value statute is to "substitute for the control power or value the minority relinquished"); Flarsheim v. Twenty Five Thirty Two Broadway Corp., 432 S.W.2d 245, 253 (Mo. 1968) (Flarsheim) (remarking that the appraisal statute "is the bargained exchange for the abolition of the requirement of

-7-

unanimous consent to approve a transfer of the assets of a corporation"); see also HMO-W, Inc. v. SSM Health Care System, 611 N.W.2d 250, 254 (Wis. 2000) (HMO-W, Inc.) (noting that "the appraisal remedy has its roots in equity and serves as a quid pro quo: minority shareholders may dissent and receive a fair value for their shares in exchange for relinquishing their veto power").

The appraisal statute provides an equitable remedy, compensating minority shareholders for their lack of control and ensuring that they retain the same proportionate value of their stock regardless of undesired changes dictated by majority vote. Dreiseszun, 577 S.W.2d at 907 ("the underlying purpose [of the appraisal statute] is to assure such dissenting minority shareholders an equitable, just, and 'fair value' for their stock"); Lawson Mardon Wheaton, Inc. v. Smith, 734 A.2d 738, 748 (N.J. 1999) (Lawson Mardon Wheaton) ("[t]he very nature of the term 'fair value' suggests that courts must take fairness and equity into account in deciding whether to apply a discount to the value of the dissenting shareholders' stock in an appraisal action"). Therefore, the proper valuation of minority stock must calculate the value of the corporation as a whole and award a pro-rata share of that value to the dissenting shareholders. See Hunter, 721 F. Supp. at 1106 (declaring that "[f]air value means on-going business value, and a dissenting shareholder is entitled to his proportional or pro-rata share of the company's on-going value"); Dreiseszun, 577 S.W.2d at 908 ("a share of common stock is evidence of unit ownership of the whole, each unit being of equal value such that the sum equals the value of the whole." (citing 18 C.J.S. Corporations § 515, p. 1194)); see also Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1145 (Del. 1989) (Cavalier Oil) (holding that a minority shareholder is entitled to a proportionate interest in the corporation appraised as an entity); In re Valuation of Common Stock of McLoon Oil Co., 565 A.2d 997, 1004 (Me. 1989) (McLoon) ("[i]n the statutory appraisal proceeding, the involuntary change of ownership caused by a merger requires as a matter of fairness that a dissenting shareholder be compensated for the loss of his proportionate interest in the business as an entity"). This valuation reflects the shareholder's actual interest in the company prior to the corporate change, independent

-8-

of market variables or influences, and dictates that the fair value of a dissenter's minority share should remain equal to the value of the majority shares. <u>See</u> <u>Dreiseszun</u>, 577 S.W.2d at 906 (holding that the classification of stock as minority or majority shares must not affect actual value).

The American Law Institute explicitly confirms the interpretation of fair value as the proportionate share of the value of 100 percent of the equity, by entitling a dissenting shareholder to a "proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability." American Law Institute, Standards for Determining Fair Value, Principles of Corporate Governance: Analysis and Recommendations (ALI) § 7.22(a) (1994). <u>See also</u> Business Valuation Selected Advanced Topics, Model 2.5 Dissenting Shareholder Actions and Fair Value, American Society of Appraisers (1997) (declaring a trend towards "defining fair value as a pro-rata share of the value of 100 percent of the equity"). Comment e to § 7.22 explains that in an appraisal proceeding, absent extraordinary circumstances, the corporation should be valued as a whole and allocated proportionately. ALI § 7.22 cmt. e.

Contrary to the Company's contention, "fair value" in minority stock appraisal cases is not equivalent to "fair market value." Dissenting shareholders, by nature, do not replicate the willing and ready buyers of the open market. Rather, they are unwilling sellers with no bargaining power. <u>See</u> Harry J. Haynsworth, *Valuation of Business Interests*, 33 Mercer L. Rev. 457, 459 (1982) (explaining that fair market value attempts to reflect "the context of a hypothetical sale between a willing seller and buyer, a situation that does not exist in the dissenting shareholder situation"); <u>see also</u> Joseph W. Anthony & Karlyn V. Boraas, *Betrayed, Belittled ... But Triumphant: Claims of Shareholders in Closely Held Corporations*, 22 Wm. Mitchell L. Rev. 1173, 1186 (1996) (contending that, particularly "in the close corporation setting where there is no ready market for the shares and consequently no fair market value," "'[f]air value' is not the same as, or short-hand for, 'fair market value.' 'Fair value' carries with it the

statutory purpose that shareholders be fairly compensated, which may or may not equate with the market's judgment about the stock's value."); Barry M. Wertheimer, *The Shareholders Appraisal Remedy and How Courts Determine Fair Value*, Duke L.J. 613, 636-37 (1998) (Wertheimer) (discussing the unreliability of market price due to its dramatic fluctuations and susceptibility to manipulation by insiders or majority shareholders).

The purpose of a marketability discount is to "adjust for a lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation." Lawson Mardon Wheaton, 734 A.2d at 747. Because "fair market value" is irrelevant to the determination of fair value, market forces, such as the availability of buyers for the stock, do not affect the ultimate assessment of fair value in an appraisal proceeding. The American Law Institute interprets "fair value" as not including any discount, "absent extraordinary circumstances," for "lack of marketability." ALI § 7.22(a). Comment e to § 7.22 further clarifies that extraordinary circumstances must consist of more than an absence of a trading market in the shares. Id. at cmt. e. See also Advanced Communication Design, Inc. v. Follett, 615 N.W.2d 285, 292 (Minn. 2000) (Follett) (allowing a marketability discount only in an extraordinary circumstance where an unfair wealth transfer occurred from the remaining shareholders to the dissenting shareholder).

The marketability discount is incompatible with the purpose of the appraisal right, which provides dissenting shareholders with a forum for recapturing their complete investment in the corporation after they are unwillingly subjected to substantial corporate changes beyond their control. See Hunter, 721 F. Supp. at 1107 ("the purpose of the appraisal statute is to award the dissenter the value of what he owned" before a significant corporate change); see also Cavalier Oil, 564 A.2d at 1145 ("the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred"). A discount for lack of marketability is inappropriate

because the minority shareholders are not willing sellers. See First Western Bank Wall v. Olsen, No. 21441, 2000 WL 33146945 (S.D. January 31, 2001) (First Western Bank) (observing that a marketability "discount is especially inapplicable in a dissenters' rights context, as a ready market does exist for the dissenters' shares, namely the majority shareholder or the corporation itself"); Columbia Management Co. v. Wyss, 765 P.2d 207, 213 (Or. Ct. App. 1988) (noting that "because a dissenting shareholder is exercising a right designed for his or her protection, and because the purchaser of the shares will be the corporation, not an outsider, this recognition of decreased market value may not be appropriate"). Imposing a marketability discount would benefit the majority shareholders at the expense of the minority shareholders, in direct conflict with the purpose of the statute. See Follett, 615 N.W.2d at 292 (noting that marketability discounts might create "[a] result that allows majority shareholders to reap a windfall by buying out or that encourages corporate squeeze-outs," which "is contrary to the statutory purpose to provide a remedy to minority shareholders").

In fact, no Missouri court has ever applied a discount for lack of marketability in a dissenting shareholders' appraisal action. On the contrary, most courts have refused to apply a marketability discount in fair value cases. See Cavalier Oil, 564 A.2d at 1144-45 (rejecting under Delaware law application of a marketability discount as contrary to the requirement that the company be valued as a going concern); Arnaud v. Stockgrowers State Bank, 992 P.2d 216, 217 (Kan. 1999) (holding that under Kansas law neither minority nor marketability discounts are appropriate when the purchaser of the stock is either the majority shareholder or the corporations, because the sale results in a windfall to those already in control); Lawson Mardon Wheaton, 716 A.2d at 563 (New Jersey) ("[t]he history and policies behind dissenters' rights and appraisal statutes lead us to conclude that marketability discounts generally should not be applied when determining the 'fair value' of dissenters' shares in a statutory appraisal action"); First Western Bank, 2000 WL 33146945 (South Dakota) (deciding that a non-marketability discount may not be applied to the valuation of shares in an appraised proceeding).

-11-

We conclude that the market for minority stock in a dissenting shareholders' appraisal proceeding, absent extraordinary circumstances, is not a relevant fact or circumstance to consider when determining fair value. We hold that the facts of the present case do not constitute extraordinary circumstances warranting a discount for lack of marketability in the determination of the fair value of the stock. Rather, the illiquid nature of the stock is precisely the type of minority stock held in a close corporation which Missouri's appraisal statute is designed to protect. To remain consistent with this purpose of compensating the dissenting shareholders for the full proportionate value of their stock, we affirm the decision of the district court to refrain from discounting the minority stock for lack of marketability.

## II.     Methodology of Evaluation

The Company also argues that the district court erred in failing to provide a precise mathematical calculation of its determination of fair value. The ultimate determination of fair value is an issue of fact, so we review for clear error. See Flarsheim, 432 S.W.2d at 255 (proclaiming that under Missouri law, the judgment of the trial court will not be set aside unless clearly erroneous). The district court has wide discretion in determining fair value, King, 765 S.W. 2d at 306, and may ascertain "proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court." Weinberger v. UOP, Inc., 457 A.2d 701, 713 (Del. 1983).

Because the district court's determination of the stock price falls within the range proposed by the experts discussed in its opinion, we hold that there has been no error. The district court issued an extraordinarily thorough memorandum, summarizing the different valuation methods proposed by each expert and weighing the pros and cons of each method. The district court explained that it generally agreed with the expert Reilly's valuation of the company, with the exception that Reilly's price reflected too

much optimism about the future growth prospects for the Company. Consequently, the district court adjusted its valuation of the entire company downward.

It is unfortunate that, after performing such a well-reasoned and thorough review of the record, the district court was not more explicit in elaborating how it reached its final calculation of price per share. Regardless, the district court is not required to provide explicit detail or mathematical precision in fair value cases, since "the very nature of most cases precludes proof of value and damage with the precision of mathematical computation." Phelps v. Watson-Stillman Co., 293 S.W.2d 429, 432 (Mo. 1956). It is also permissible for a district court to arrive at a determination of fair value that is not advocated by any of the experts. See King, 765 S.W.2d at 307. Therefore, we hold that the district court's determination of the price-per-share was not clearly erroneous.

Cross-Appeal No. 99-3178

I.      Application of Minority Discount

Appellees argue that the district court erred by discounting the value of the Company's stock to account for its minority status. We agree.

The purpose of a minority discount is to "adjust for lack of control over the business entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions." Lawson Mardon Wheaton, 734 A.2d at 747 (citing Edwin T. Hood et al., *Valuation of Closely Held Business Interests*, 65 UMKC L. Rev. 399, 438 (1997). However, like a marketability discount, the application of a minority discount is not appropriate in an appraisal action, where the minority sellers are unwilling to dispose of their stock. See HMO-W, Inc., 611 N.W.2d at 256 (concluding that "the application of a minority discount in determining the fair value of a dissenter's shares

-13-

frustrates the equitable purpose to protect minority shareholders"). As discussed above, such a discount injects a market factor into the determination of fair value, which we have concluded is not "a relevant fact or circumstance" to be included in the calculation of the value of minority stock under an appraisal statute. The market cannot adequately reflect the position of dissenting minority shareholders. See Hansen, 957 P.2d at 41("[s]ince there is no 'market' involved in an inside transfer of shares, the minority discount should not be applied"). Rather, minority shareholders are entitled to receive the full value of their shares as if they were able to retain the stock.

The application of a minority discount undermines the purpose of a fair value appraisal statute by penalizing minority shareholders for their lack of control and encouraging majority shareholders to take advantage of their power. The overriding principle holds that "to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process." Cavalier Oil, 564 A.2d at 1145. See, e.g., Hunter, 721 F. Supp. at 1106 (observing that fair value cannot be obtained by permitting majority shareholders to set a hypothetical market price for the stock because it "would impermissibly allow the majority shareholders to determine the value of the minority stock based on the price the majority shareholders are willing to pay for the minority shares"); McLoon, 565 A.2d at 1005 (noting that "[a]ny rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control"); Hansen, 957 P.2d at 41(stating that "requiring the application of a minority discount when selling to an 'insider' would result in a windfall to the transferee" because it "simply consolidates or increases the interests of those already in control"); HMO-W, Inc., 598 N.W.2d at 256 (warning that "otherwise, the majority may 'squeeze out' minority shareholders to the economic advantage of the majority" and inflict a "double penalty" because "[t]he shareholder not only lacks control over corporate decision making, but also upon the

application of a minority discount receives less than proportional value for loss of that control").

Most courts addressing the issue have refused to apply minority discounts, reasoning that "using discounts injects speculation into the appraisal process, fails to give minority shareholders the full proportionate value of their stock, encourages corporations to squeeze out minority shareholders, and penalizes the minority for taking advantage of the protection afforded by dissenters' rights statutes." Blitch v. Peoples Bank, No. A00A1024, 2000 WL 156873 at *2 (Ga. Ct. App. Oct. 23, 2000); see, e.g., Cavalier Oil, 564 A.2d 1137 (Delaware); Security State Bank v. Ziegeldorf, 554 N.W.2d 884 (Iowa 1996); Arnaud v. Stockgrowers State Bank, 992 P.2d 216 (Kansas); McLoon, 565 A.2d 997 (Maine); Hansen, 957 P.2d 32 (Montana); Rigel Corp. v. Cutchall, 511 N.W.2d 519 (Neb. 1994); First Western Bank, 2000 WL 33146945 (South Dakota); In re Stock of Trapp Family Lodge, Inc., 725 A.2d 927 (Vt. 1999) (Trapp Family); see also Wertheimer, 47 Duke L.J. at 635 (noting the unavailability of minority discounts in the majority of courts).  We agree with the reasoning of these courts and likewise hold that minority status of the stock is not a relevant fact or circumstance to be considered in a dissenting shareholders' appraisal proceeding.  Therefore, a minority discount is incompatible with the accurate determination of fair value under § 351.455.

The Company asserts that this court does not have the authority to disallow minority or marketability discounts because only the Missouri state courts are capable of rendering such interpretations of Missouri statutes under the Erie doctrine. Erie v. Tompkins, 304 U.S. 64 (1938).  While it is true that Missouri's state court precedents have permitted minority and marketability discounts at the discretion of the trial court, the Missouri Supreme Court has not considered the issue.  We agree with the general proposition that "a federal court with diversity jurisdiction is bound only by state law as determined by the highest state court." Foy v. Klapmeier, 992 F.2d 774, 780 (8th Cir. 1993).  However, where the state's highest court has not ruled, we must follow the

decisions of the state's intermediate courts when they are the best evidence of what the state's law is. See Marvin Lumber and Cedar Co. v. PPG Industries, 223 F.3d 873, 883 (8th Cir. 2000); Bureau of Engraving, Inc. v. Federal Ins. Co., 5 F.3d 1175, 1176 (8th Cir. 1993); Garnac Grain Co., Inc. v. Blackley, 932 F.2d 1563, 1570 (8th Cir. 1991).

In the present case, we are not bound by Missouri's intermediate appellate court decisions because we are "convinced by other persuasive data that the highest court of the state would decide otherwise." See Marvin Lumber, 223 F.3d at 883 (quoting Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967)). Specifically, we find Delaware's decisions on this matter persuasive, not only because of Delaware's expertise in analyzing issues of corporate law, but also for its reasoning in the seminal case of Cavalier Oil, in which the Delaware Supreme Court convincingly justified the rejection of minority and lack of marketability discounts. We are also influenced by the logic of other state courts who have interpreted their similarly-worded appraisal statutes to disallow minority and lack of marketability discounts. See Security State Bank v. Ziegeldorf, 554 N.W.2d 884 (Iowa); see also Arnaud v. Stockgrowers State Bank, 992 P.2d 216 (Kansas); McLoon, 565 A.2d 997 (Maine); Hansen, 957 P.2d 32 (Montana); Rigel Corp. v. Cutchall, 511 N.W.2d 519 (Nebraska); First Western Bank, 2000 WL 33146945 (South Dakota); Trapp Family, 725 A.2d 927 (Vermont). While the district court correctly observed that many states have held that the application of discounts is discretionary, only one of those decisions was issued after the influential Cavalier Oil decision. See Stanton v. Republic Bank, 581 N.E.2d 678, 682 (Ill. 1991) (approving minority and lack of marketability discounts applied at the trial court's discretion).[3] As a result, we conclude that if deciding the issue today, the Missouri

---

[3]The Company argues that because Stanton was decided in Illinois and Mo. Rev. Stat. § 351.455 was originally based on Illinois's appraisal statute, we should adopt Stanton's reasoning. We find this argument unpersuasive, both because the language of appraisal statutes is similar throughout all the states, and because the weight of authority tends to support the rejection of minority and lack of marketability discounts.

Supreme Court would follow the compelling logic of the current trend toward disallowing minority and marketability discounts in dissenting shareholders' fair value appraisal determinations.

Because the district court's final determination of the minority shareholders' price-per-share presumably reflected a discount for minority status based on an erroneous assumption of law, we remand to the district court for a re-evaluation of the fair value of the stock consistent with this opinion.

II.    Rate of Prejudgment Interest

Appellees contend that the district court erred in applying a federal prejudgment interest rate rather than the state statutory rate.  Whether the rate of prejudgment interest in a diversity case should be that specified by state law rather than the federal prejudgment rate is a question of law and should be reviewed *de novo*.  See Kisco Co., Inc. v. Verson Allsteel Press Co., 738 F.2d 290 (8th Cir. 1984).

Mo. Rev. Stat. § 351.455(3) expressly states that a dissenting shareholder seeking appraisal is entitled to judgment based on the fair value of the stock as of the day prior to the date of the vote approving the corporate action, "together with interest thereon to the date of such judgment."  Appellees claim that Mo. Rev. Stat. § 408.020 mandates a rate of 9% interest whenever, as in this case, the statute requires prejudgment interest but does not specify the rate.[4]  We agree.

_____

[4]Mo. Rev. Stat. § 408.020 states that:

Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made; for money recovered for the use of another, and retained without the owner's knowledge of the receipt,

Although *postjudgment* interest is a procedural matter governed by federal law, Weitz Co., Inc. v. Mo-Kan Carpet, Inc., 723 F.2d 1382, 1385-86 (8th Cir. 1983), state law determines the rate of *prejudgment* interest. Nodaway Valley Bank v. Continental Cas. Co., 916 F.2d 1362, 1367 (8th Cir. 1990); Kisco Co., Inc. v. Verson Allsteel Press Co., 738 F.2d 290 (8th Cir. 1984). As a result, the district court erred in applying the federal rate of interest under 28 U.S.C. § 1961, which is reserved for postjudgment interest. Although Mo. Rev. Stat. § 351.455 does not expressly refer to the interest rate specified by § 408.020, § 408.020 should be applied whenever a rate is not specified because it is the default prejudgment interest rate under Missouri law. See Denton Const. Co. v. Missouri State Highway Comm'n, 454 S.W.2d 44, 59 (Mo. 1970) (applying § 408.020 when payment is due even though there is a dispute over legal liability); Burger v. Wood, 446 S.W.2d 436, 443 (Mo. Ct. App. 1969) (using § 408.020 to determine prejudgment interest). The purpose of the prejudgment interest is to fully compensate plaintiffs for their loss. Because the loss of the minority shareholders did not result from any market changes, the legal rate of interest dictated by § 408.020 is more appropriate than the federal rate of interest based on market information. See Nika Corp. v. City of Kansas City, 582 F. Supp. 343, 359 (W.D. Mo. 1984) (awarding prejudgment interest under Mo. Rev. Stat. § 408.020 to compensate for losses not calculated at market rates). This result is also compelled by our decision that the minority shareholders should not be confined to market influences to determine the value of their shares.

The Company argues that § 408.020 only applies when the amount of the judgment is liquidated or "is readily ascertainable by computation or by determination according to a recognized standard." United States v. Dimarco Corp., 985 F.2d 954, 959 (8th Cir. 1993). However, liquidation is only relevant in determining whether interest can be recovered, not the rate of interest. See Ritter Landscaping, Inc. v.

and for all other money due or to become due for the forbearance of payment whereof an express promise to pay interest has been made.

Meeks, 950 S.W.2d 495, 497 (Mo. Ct. App. 1997) (stating that "prejudgment interest is not recoverable" at all if there is no "readily ascertainable method" of determining the amount at stake); Wulfing v. Kansas City Southern Indus., Inc., 842 S.W.2d 133, 160 (Mo. Ct. App. 1992) (holding that interest is not allowed altogether on unliquidated damages); Burger v. Wood, 446 S.W.2d at 444 (proclaiming that prejudgment interest must be available, even "when the precise principal amount of the recovery is placed in doubt"). We therefore hold that the district court erred in not applying the state statutory interest rate mandated by Mo. Rev. Stat. § 408.020 to the appellees' prejudgment interest.

Appeal No. 00-2234

I.      Rule 60(b) Motion

The district court possesses broad discretion over whether to grant a hearing or make specific findings regarding a Rule 60(b) motion, Atkinson v. Prudential Property Co., 43 F.3d 367, 374 (8th Cir. 1994), and its decision will be reviewed only for abuse of discretion. Brooks v. Ferguson-Florissant School Dist., 113 F.3d 903, 905 (8th Cir. 1997). A district court's Rule 60(b) determination will not be overturned unless "exceptional circumstances" exist. Watkins v. Lundell, 169 F.3d 540, 544 (8th Cir. 1999).

A Rule 60(b) motion will be granted only if there is newly discovered evidence sufficient to justify setting aside the original judgment. Rule 60(b) permits consideration only of facts which were in existence at the time of trial, not opinions, which can be formulated at any time. See Lapiczak v. Zaist, 54 F.R.D. 546, 548 (D. Vt. 1972) (witness opinions developed after trial were not permitted under Rule 60(b)(2)). The Company submitted an IRS appraisal of a minority shareholder's stock for estate tax purposes. The IRS report, as evidence that was not in existence at the time of the trial but was prepared after trial, does not constitute newly discovered

evidence. Here, not only did the Company fail to procure this estate tax appraisal before trial, it obtained a protective order prohibiting full discovery of gift and estate tax appraisals. If this type of evidence were essential to a fair trial, then the Company should have obtained it and submitted it at that time, rather than deliberately removing it from consideration. Regardless, appraisals for estate tax purposes are not relevant to the determination of fair value pursuant to a dissenters' appraisal proceeding. See Lawson Mardon Wheaton, 734 A.2d at 747 (noting that valuation principles used in tax or equitable distribution appraisal actions are of limited assistance in determining fair value in a dissenting shareholders' appraisal action); McLoon, 656 A.2d at 104 (finding stock valuation used in tax and probate cases inapplicable); Trapp Family, 725 A.2d at 931 (stating that "methods of stock valuation used in tax, probate, or divorces cases to determine fair market value are inapposite to the determination of "fair value" under the dissenters' rights statute").

Moreover, the IRS report provides an opinion on the fair market value of the stock, which is irrelevant for two reasons: (1) the date in question is different from the date used for evaluation purposes under the shareholder appraisal statute, and (2) the valuation was based on fair market value, rather than fair value. As discussed above, the concept of fair market value is not consistent with the valuation of minority stock under Mo. Rev. Stat. § 351.455. As a result, we hold that the district court did not abuse its discretion in denying Rule 60(b) relief.

## Conclusion

For the reasons we have stated, we affirm in part and reverse in part and remand the case to the district court for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.