In Re: Shares of Lee Madden, No. 185-4-01 Wmcv  (Carroll, J., May 16, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                    WINDHAM SUPERIOR COURT
WINDHAM COUNTY, SS.                                 DOCKET NO. 185-4-01Wmcv


IN RE SHARES OF LEE MADDEN,
CAROLYN FULFORD and
REBECCA TRUMBULL

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**

The Court held a hearing over four days, beginning on November 8, 2004, under the Dissenters' Rights provisions of 11A V.S.A., Chapter 13.  At all times, Chroma Technology Corporation was represented by Attorney Robert Rachlin.  The dissenters were represented by Attorney Potter Stewart.  Based upon the evidence presented to the Court, the Court makes the following findings of fact:

**The Corporation**

1.  Chroma Technology Corporation was founded in Brattleboro in 1991.  All founding members were previously employed by Omega Opticals, one of Chroma's competitors.  Both are in the business of manufacturing and distributing optical filters.  These filters are used to control wavelengths of light and are used principally by biologists and those in the medical field in various instruments.  Therefore, Chroma's customer base is primarily manufacturers of instruments which use the filters.  Although Omega has been Chroma's chief competitor, companies in Europe and Japan have also been competitors.

2. Paul Millman is the Vice-President of Chroma. The corporation was originally owned by its founders, previous employees and present employees, but as of October 2000, the corporation was wholly employee owned. Chroma's culture is to reward hard work by allowing each of its employees to become an owner of the corporation. The management style at Chroma is atypical. Meetings are informal and those with greater knowledge in a given area generally were responsible for making decisions in that area. Other decisions were made in a "Town Meeting" type atmosphere. Chroma has no hierarchical management structure.

3. Chroma's wage structure is equally unique. When the corporation was started, the founders decided that $30,000 was the minimum amount a family needed to live on reasonably at that time. Everyone received this salary. When a new employee started work with Chroma, he or she received wages of $10.00 per hour for a three month probationary period. After about three years, Chroma noted that it had extra money from profits which it decided to distribute as a "retroactive wage." The funds were distributed equally to those who had been working at Chroma for at least six months and in smaller shares to those who had worked at Chroma for less than six months. This "retroactive wage distribution" (RWD) was done twice a year and all of Chroma's profits were distributed in this fashion. In the beginning of Chroma's sixth year, the corporation decided to reward longevity and the base salary was raised to $35,000 or $52,5000, if one had worked at Chroma for at least five years. Except for those still in the probationary period, every employee at Chroma is paid the same base wage, with the added RWD twice a year (usually in a range of $26,000 to $29,000 per distribution). In addition, a one time bonus was paid to founders ($50,000) and those who joined Chroma in either year one ($40,000) or year two ($30,000). In fact, a shipper at Chroma was paid $97,000.00 one year.

4.  Another component of the compensation program at Chroma involved the distribution of shares.  This distribution was not dependent upon one's job nor value to the corporation.  The original founders each bought $1,000 shares at $1.00 per share.  Later, Chroma distributed a total of 4,000 shares per annum to those who had worked at Chroma for at least a year.  The amount of shares was divided by the number of eligible employees.  After an initial five year period, Chroma decided to issue a certain amount of shares per person, per annum equally to all employees (unless one had not yet completed the probationary period).  This program continued through October 2000.

5.  The unorthodox and loose management structure led to problems and disagreements at Chroma.  Lee Madden came to Chroma, at the founders' request, in September 1991, having also previously worked at Omega.  The last three founders had arrived at Chroma in August 1991.  Lee Madden became the employee who principally oversaw the financial, personnel, and legal aspects of Chroma.  Soon after his arrival, the cordiality and mutual respect among employees dissipated.  There were major disagreements about finances, although the product continued to be manufactured and distributed successfully.  When the employee number reached almost 50 by April 2000, some chose to not make the regular distribution of shares to those who had been employed at Chroma for the requisite period of time for fear that continued distribution of shares was diluting the value of the shares already distributed.  Lee Madden objected to this proposal, arguing that some employees had come to Chroma with the understanding that the shares would be distributed in the manner they always had been.  At least one Chroma employee left the corporation because of this action.

6.  Problems also surfaced regarding the unavailability of understandable financial

3

statements, the fact that the financial committees were not meeting regularly, and the lack of a protocol to buy out those leaving Chroma. The corporation was ill prepared to address the buy-out of a departing employee. Because of this, Madden met with an accountant and decided that a departing employee would be paid 1.3 times book value. This was later modified to 1.25 times book value upon the suggestion of the accountant.

7. No employee at Chroma has an employment contract. Employees are not required to sign a non-compete agreement nor a confidentiality agreement. Despite this, Chroma acknowledges that if certain key employees left Chroma, its status in the scientific community would be greatly affected. In addition, if one of these employees began to work for a competitor, it would seriously affect Chroma's future success.

8. In October 1996, Omega Optical filed a lawsuit against Chroma and certain key employees who previously worked for Omega, claiming, among other things, use of trade secrets. (See Omega Optical v. Chroma Technology Corp., et al., Docket No. 370-10-96Wmc, Decision and Order, Grussing, J., November 24, 1999). After more than three weeks of hearing, the Court entered judgment for all defendants on all of plaintiff's claims. However, Omega appealed Judge Grussing's order and the appeal was still pending before the Vermont Supreme Court on October 25, 2000. Chroma incurred legal expenses of approximately $2.5 million and an adverse decision by the Supreme Court could have resulted in Chroma's key employees being prohibited from working in the optical lens field in the future and utilizing knowledge gained while they worked at Omega. This could have resulted in the demise of the corporation.[1]

_____

[1]Judge Grussing's decision was affirmed by the Supreme Court on April 12, 2002 in Omega Optical, Inc., v. Chroma Technology Corporation, Richard Stewart, et al., 174 Vt. 10

However, Chroma never put any money in reserve in the event the appeal was not decided in its favor. In addition, notes to financial statements, of April 30, 1999 refer to the Omega litigation and indicate that "The Company believes that the plaintiff's case is without merit." (See Defendant's Exhibit G, Note J)

9. In either 1995 or 1996, Lee Madden was diagnosed with a serious illness requiring lengthy treatment and decreased ability to perform his responsibilities at Chroma.

**The Vote and Determination of Value**

10. On October 25, 2000, a majority of Chroma shareholders voted to amend the Articles of Incorporation which, in effect, created two classes of stock and required those leaving employ at Chroma to sell their shares back to Chroma for pro-rata book value of the shares plus exchange for Class B shares which decreased in value over a period of time. Pursuant to the amendment, the original founders of Chroma were awarded Class A shares which allowed them to retain their proportionate interest in the corporation in perpetuity. Lee Madden, Carolyn Fulford, and Rebecca Trumbull each voted their shares against the proposed action and demanded payment of _fair_ value for their shares. Previous to this action, departing employees wishing to sell their shares back to Chroma were paid _book_ value for the shares. In October 2000, Madden was working part-time and Fulford and Trumbull were no longer employed at Chroma but retained their shares. At the time of the vote, there were 38,073 outstanding shares of Chroma common stock. The Dissenters owned 10.866% of the shares as follows: Madden (2,492); Fulford (1,526); and Trumbull (119).

11. Chroma decided to pay and did pay $64.69 per share to the Dissenters which

(2002). This is not relevant to this case, however, because the Court is required to focus on the

5

represented an accountant's computation as to book value. On February 17, 2001, the Dissenters notified Chroma via letter that they were dissatisfied with this calculation. Madden proposed $13,177,933 as the fair value of Chroma, relying in part on an expression of interest from an outside corporation which was interested in purchasing Chroma after assessing Chroma's financials and projected future earnings.

12. On September 15, 1999, Paul Millman sent an e-mail to other Chroma employees in response to an e-mail from Becky Trumbull regarding pending issues at Chroma. In the e-mail, Millman states that, at the time, $25,000,000.00 would not be "an impossible number" as a selling price for Chroma.

13. During December 1999, then President Dick Stewart received an expression of interest in purchasing Chroma from a company known as Cybron. Stewart considered the interest serious and in good faith. Cybron was a company traded on the New York Stock Exchange. The company inquired about a sale of Chroma for $12 to $15 million. Chroma terminated any discussion prior to a site visit by Cybron representatives. Even after this point, Cybron continued to be interested in an acquisition of Chroma. Stewart told Cybron that Chroma was not interested and Chroma would let Cybron know if things changed. During Chroma's discussions with Cybron, Stewart informed Cybron representatives of the pending litigation with Omega and that Chroma was optimistic about its outcome.

14. On February 1, 2001, at a Board of Directors meeting, those present discussed what amount to offer the Dissenters per share. Millman motioned that the three dissenters be paid consistent with a January 31, 2001 letter from John Simard (who had taken over Lee Madden's

status of the litigation on October 25, 2000.

6

position) which bases the buy out price on "book value." On the same day, Simard sent Madden a letter advising him of rights of dissenters under state law, a copy of the statute, a copy of the corporate balance sheet, a letter from the accountant calculating book value, and a check payable to Madden. (Defendant's Exhibit V). Although Simard's letter references a calculation as to "fair value," his previous letter to the Board references the calculation of "book value" and the letter sent by the accountant, which was relied upon by Chroma at the February 1 meeting, clearly stated the calculation represented "book value." The accountant determined that, at the time of the vote to amend the Articles of Incorporation, Chroma's book value was $2,897,784.66. By this time, and until the time of hearing, Chroma had never directed Simard nor its accountant to try to arrive at the corporation's "fair value." Simard knew about the Cybron expression of interest at $12 million to $15 million at the time he relied on the book value calculated by the accountant at just under $3 million. In addition, Simard recalls Chroma shareholders discussing the potential reversal on appeal as depreciating the value of the company. However, at the time he authored the January 31, 2001 letters he was also aware of a letter written by Lee Madden which indicated that Chroma and its attorneys were confident that the trial court decision would be affirmed. Simard was also aware that sales projections were increasing, that Chroma was hiring new employees, and that the corporation was expanding to new facilities due to increased business. Prior to the actual vote on October 25, 2000, Simard had already decided that if any shareholder dissented, he or she would be paid his or her share of book value and that this was equivalent to the fair value of Chroma.

15. At all times, Chroma intended to pay the dissenters their share of the "book value" of the corporation. In fact, Chroma never considered the concept of paying the dissenters their

share of the corporation's "fair value" until the remaining members consulted with their attorneys. However, in a September 9, 1999 memo from Millman to "everyone," he concludes that buying out departing employees based upon Chroma's book value was "low priced" and "unfair." He further states "I believe that we are all guilty of not finding a better method for valuing our shares."

16. On October 25, 2000, Chroma was planning on expanding its field of employees, its customer list was increasing, and Chroma expected to ship $13 million in that fiscal year. In addition, Chroma was building a new site in Westminster. The building and some of the new equipment would be financed by debt. Written notes by Paul Toomey, the first accountant hired by the Dissenters to value the corporation pursuant to this litigation, indicate that management intended to finance equipment with debt and that some equipment already purchased had been financed via debt. Records indicate that Chroma had incurred debt through both Chittenden Trust Company and Vermont Economic Development Authority. Historically, Chroma used to debt to finance new equipment and the equipment was used as collateral.

**The Experts**

17. Howard Gordon was hired by Chroma to perform a business valuation and arrive at Chroma's fair value as of October 25, 2000.[2] Fair value is described as what a reasonable and willing buyer would pay a willing seller, while knowing all the facts and while under no compulsion to act. In deciding this, Gordon's primary area of concern was the pending litigation between Chroma and Omega. Gordon opines that a knowledgeable and willing buyer would

___

[2]The Court will not make extensive findings as to the credentials of the experts called. The Court is confident based upon the evidence presented that each of the experts who testified

realize that if Chroma did not prevail on appeal, the end result would prohibit Chroma from producing and selling a majority of it products and put Chroma out of business. According to Gordon, a buyer would not even consider the likelihood of the outcome of the litigation being favorable or unfavorable to Chroma; the mere fact that the litigation was pending would be enough for a buyer to refuse to purchase the company and to not assume the risk.

18. Other factors which Gordon considered in arriving at fair value included the fact that there were no employment contracts with key employees; employees were not required to sign non-compete agreements; and there existed no prohibition against the distribution of trade secrets by employees. According to Gordon, any willing buyer would take issue with this failure to protect intellectual property. Gordon also believes that buyers would be uncomfortable with the untraditional and socialistic management structure and the unconventional pay structure at Chroma so much so that the corporation would be unmarketable.

19. Based upon the concerns expressed above, Gordon believes that the fair value per share of Chroma on October 25, 2000, while considering the pending Omega litigation, was equal to its book value per share, or $64.00. If one were not to consider the pending litigation in determining fair value, the value per share would be $140.00.

20. There are three general methods of determining fair value of a closely-held business: the market method, the income approach, and the cost or asset approach. Both valuation experts in this litigation utilized the income-based approach, specifically a discounted cash flow approach. This method of analysis is appropriate when the business at issue expects future cash flows which are substantially different than the current cash flow. In this case, Chroma projected

possesses the education, skill, and experience necessary to arrive at his opinions.

9

substantial growth, making the discounted cash flow approach applicable. In determining fair value, one would measure the earning capacity of the business and then capitalize that earning capacity by an appropriate multiple. (See Defendant's Exhibit A, <u>Valuation Report</u> of Edward Gallagher, C.P.A., C.V.A. at p. 19).

21. Using the income approach, one considers the investor's required rate of return; generally, the higher the risk, the higher the rate of return. Investors will pay less for riskier companies but will usually reap the benefits of a higher rate of return.

22. In order to perform this valuation, the accountant must first project future net income and convert this to cash flow. This would include a consideration of depreciation, future capital expenditures, working capital requirements, repaying debt, and future financing with debt. This exercise takes into account the future growth rate. Finally, a discount rate is applied to discount the projected cash flow to its present value at a rate which reflects the risk of investment in the company. In this analysis, both parties' experts relied on the same numbers for projected operating income through the year 2006. However, the projected cash flow differed after the experts considered future expenditures and debt. Both experts applied the same approximate rate of growth. While adjusting the projected cash flow, Gordon assumed that all future equipment purchases at Chroma would be paid for using existing capital, thus decreasing projected cash flow. The Dissenters' expert assumed that debt would be used to finance future equipment purchases.

23. There is more than one approach that may be used in determining the appropriate discount rate: the build-up method and the capital asset pricing method (CapM). Using the build- up method, one would look at the risk free rate, usually defined as the yield on long-term

10

government bonds, then add increments of risk premiums for considerations such as, for example, the size of the company. In addition, other subjective judgments are made. The CapM method is similar but one would factor in more industry-specific information including the volatility of pricing in certain industries. For this method, these industry specific risks have already been calculated as BETA scores. Chroma's expert arrived at a fair value of Chroma stock using each approach. The Dissenters' expert utilized only the build-up method, finding it most appropriate due to the difficulty in locating guideline companies similar to Chroma which would be required under the CapM method.

24. In considering the build-up method, Gordon utilized the figure of 6% as the average yield on long term government bonds. He then added an equity premium of 7.8%, relying on the 2001 *Ibbotson's Stocks, Bonds, Bills and Inflation Yearbook*, a source commonly relied up by experts in this field to reflect the more risky nature of equity securities. Again, relying on *Ibbotson*, Gordon then added a micro-capitalization premium, or small stock premium, of 5.4%, which is applied to "publicly traded companies with total capitalization of less than approximately $192 million." (See Defendant's Exhibit D, Chroma Technology Corp. Valuation Study by Howard J. Gordon, C.F.A., at p. 31). *Ibbotson*, however, suggests that this small stock premium figure should be adjusted with beta information if available. The beta adjusted number, according to *Ibbotson*, is 2.6%. Gordon thus arrived at 19.2% as of the total cost of equity for small public companies.

25. When Gordon performed a similar analysis under the CapM method, he again began with 6.0% as the risk free rate and applied it to the CapM equation. Next, Gordon set out to determine an appropriate beta using the generally accepted principal that a company with a beta

11

of less than 1.0 is less risky relative to the overall market than a company with a beta of more than 1.0 which presents a higher risk. Since beta is calculated only for publicly held companies, Gordon attempted to determine a beta for Chroma by selecting an appropriate substitute in the area of the optical instruments and lens industry. The beta selected is 1.26 which was also applied to the equation along with the previously discussed historical equity premium of 7.8%. Finally, Gordon used a beta adjusted small stock premium, mentioned above at 5.4%, of 2.6%. Utilizing the equation, the cost of equity is 18.4% according to Gordon. He then averaged the figures arrived at under both the build-up and CapM methods and arrived at an average cost of equity of 18.8%.

26. After performing the above calculations, Chroma's expert then adjusted this 18.8% by adding a company specific risk factor of 3.0%. This was done, according to Gordon, to reflect that the cost of equity is based upon returns of companies "with up to approximately $192 million in total capital," Id. at 33, and based upon the fact that he believes Chroma is significantly smaller than these companies. Adding this 3.0% to the 18.8%, Gordon concluded that the total cost of equity for Chroma equals 21.8%.

27. Using this figure, Gordon used the projected cash flow numbers and discounted them to present value. This resulted in a present value of Chroma on October 25, 2000 of $2,057,000, resulting in price per share of $140.00 based upon 38,073 shares outstanding.

28. Gordon considered but refused to apply a control premium to his valuation. Although he recognized that a controlling interest in a company is more valuable than a minority interest, and that a premium is sometimes appropriate in determining the value of a controlling interest, Gordon did not apply one because he determined that his valuation method already

12

considered the elements of control and that the controlling interest was outweighed in this case by a lack of marketability due to the unusual compensation and management policies at Chroma.[3]

29. Gordon played an integral part in the previously reported valuation case of In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc., 169 Vt. 82 (1999). While performing a valuation for the dissenters in that case, Gordon utilized a small stock premium of 4.0%, rather than the 5.4% used in this case. The difference of 1.4% represents an increase of 35% and if Gordon had used the small stock premium of 4.0% in this case as well, it would have had the effect of decreasing the discount rate and increasing the value of Chroma on the valuation date. In addition, under the CapM method, in this case, Gordon added a "small company stock premium" to his calculation when, in *Trapp*, he did not do so. Once again, this has the effect of increasing the discount rate and lower Chroma's value as of the valuation date. Finally, in *Trapp*, Gordon did not add a company specific premium and he agrees this is a subjective decision. In this case, Gordon added a 3% company specific premium, citing in part the small size of Chroma. However, in *Trapp*, the annual sales were approximately one-half of those in this case.

30. With regard to the control premium which Gordon did not apply in Chroma's valuation, Gordon did utilize the control premium in *Trapp*. A control premium adjustment is appropriate when the discount rate has been derived from data based upon publicly traded stocks

---

[3]The Court will not discuss the "marketability discount" at great length. Gordon's report indicates that while he did not apply a control premium, it may be offset by a lack of marketability discount. However, Gordon did not discuss a specific discount in either his report or in his testimony and did not apply one in is valuation. Thus, the Court will not consider one.

(reflecting a minority position) and when projected cash flows have not been adjusted to reflect specific and predictable improvements in cash flow. In this case, despite the fact that Gordon arrived at his discount rate using data from publicly held companies and did not adjust the projected cash flow to reflect projected improvements, he did not utilize a control premium. In *Trapp*, Gordon not only adjusted cash flow to reflect expected improvements, but he used a control premium as well. On the one hand, Gordon believes that it is not appropriate to adjust future cash flow to reflect improvements, but on the other hand, Gordon applied in this case a 3% company specific rate to account for poor management and the unusual wage structure which is, in essence, "double dipping" by considering these issues in four different areas of his valuation.

31. The Dissenters hired Gallagher, Flynn & Company to perform a valuation on Chroma for purposes of this litigation. This valuation was originally done by Paul A Toomey, but after his untimely death, Edward Gallagher, CPA, CVA, took the case over. He produced a report dated may 6, 2004.

32. Gallagher did not use the CapM method in developing a discount rate for the valuation of Chroma because he did not believe he could locate publicly traded companies which were similar enough to Chroma so that the beta selected would not be a valid one. In considering the build-up method, Gallagher utilized the same risk free rate as Gordon, or 6.04%, and the same equity risk for large stocks of 7.8%. Thereafter the analysis changed. In the size premium category, where Gordon used 5.4%, Gallagher adjusted this as suggested by *Ibbotson*, so as not to double count the risk, and arrived at a figure of 2.6%. Gallagher then added a company specific risk factor of 2% concluding with an overall discount rate of 18.5%. As stated

14

above, Gordon had arrived at a similar number, but then adjusted it with a 3% specific company risk rate resulting in a lower overall discount rate.

33. In the area of determining future cash flow, Gallagher used much information obtained from Chroma by Gordon, as Gordon had superior access to management at Chroma. In considering future capital expenditures, Gallagher relied on information given to his predecessor Paul Toomey by Chroma management, that future acquisitions would be financed, totaling financing of at least $900,000 in 2001, $1,000,000 the next year, and $500.000 in the following years.

34. Gallagher applied a control premium to his valuation. Although Paul Toomey did not add a control premium, Toomey did adjust cash flows by normalizing the unusual wage structure at Chroma. When the Superior Court ruled that the wage structure could not be normalized for purposes of valuation[4], Gallagher applied a control premium in its place. This substitution actually benefits Chroma in this litigation by lowering the company's value by approximately $12 million. Gallagher used a control premium so that a controlling interest would be represented upon a hypothetical sale of Chroma; otherwise, only a minority interest would be represented. Gallagher utilized the control premium, rather than adjusting future cash flow in a manner to reflect what a controlling buyer would likely do.

35. Gallagher did not consider, when performing his valuation, the Omega litigation which was pending on October 25, 2000. Gallagher believes that a potential buyer would consult with attorneys, prior to making a decision to purchase, in an effort to decide the likely

---

[4]See Opinion and Order on Chroma's Motion for Partial Summary Judgment and to Exclude, Wesley, J, Docket No. 185-4-01Wmcv, September 23, 2003.

15

outcome of the litigation and whether it would affect the future viability of Chroma.

36. Neither Gordon nor Gallagher could advise the Court how one would take the pending litigation into account when conducting a valuation. There is no accepted method for doing so.

37. Gene Laber is a consulting economist and a Professor Emeritus at U.V.M.. Laber has a PhD in Economics. He was asked by the Dissenters to look at the valuation reports of Gordon, Toomey and Gallagher and to express an opinion as to the issues discussed above. Initially, Laber disagrees with Gordon's assumption that Chroma would not, in the future, use debt to fund purchases. There are many advantages to use of debt and judicious use of debt is quite beneficial.

38. Laber also agrees with Gallagher's use of a beta adjusted small stock premium, which Gordon did not utilize. Laber also takes exception with Gordon's use of the 2.6 percent beta adjusted small stock premium under the CapM method because Gordon had already captured the risk of this company with a beta coefficient. Gordon did not use a similar procedure in the *Trapp* case where he was hired by the Dissenters. Finally, Laber disagrees with Gordon's decision to add a 3% company specific premium in this valuation. He believes this decision is too speculative and is not appropriate. There is no basis for this documented in the literature and studies. Laber also disagrees with Gallagher's use of 2%.

39. Laber agrees with Gallagher that a control premium was necessary in this case because Gallagher had not adjusted cash flow based upon what a controlling purchaser would do. Control of the company must be taken into account and use of the control premium was important and appropriate.

16

40. Laber believes that Gordon's consideration of the effect of the pending litigation was also misplaced. Litigation is a widespread phenomenon and securities of companies involved in litigation are routinely traded and purchased. In fact, creditors were allowing Chroma to finance through debt at the prime rate while the Omega litigation was pending indicating a confidence in the future of Chroma despite the pending litigation.

**CONCLUSIONS OF LAW**

Vermont Dissenters' Rights Statute is found at 11A V.S.A. Chapter 13. There is no question that Lee Madden, Carolyn Fulford, and Rebecca Trumbull are "dissenters" within the meaning of the statute. (See 11A V.S.A. §13.01(2)( "Dissenter means a shareholder who is entitled to dissent from corporate action under 13.02 of this title and who exercises that right when and in the manner required by sections 13.20 through 13.28 of this title."). The statute provides for specific procedures to occur in order for dissenters to be paid the fair value of their shares. Because the effect of these provisions is not in dispute in this case, the Court will not discuss them. The important provision in this case is:

> **§13.02 Right to dissent** (a) A shareholder is entitled to dissent from, *and obtain payment of the fair value of his or her shares* in the event of, any of the following corporate actions:......(4) Amendment to articles...." (*Italics* added).

This Court is required to enter judgment for the dissenters "(1) for the amount, if any, by which the court finds the fair value of his or her shares, plus interest, exceeds the amount paid by the corporation; or (2) for the faire value, plus accrued interest, of his or her after-acquired shares for which the corporation elected to withhold payment under section 13.27 of this title." 11A V.S.A. §13.30(e).

"Fair Value" is defined under the statute as "the value of the shares immediately before

17

the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." 11A V.S.A. §13.01(3). The date of the corporate action in this case is October 25, 2000.

The Vermont Supreme Court has defined "fair value" as follows:

The basic concept of fair value under a dissenters' rights statute is that the stockholder is entitled to be paid for his or her proportionate interest in a going concern. The focus of the valuation is not the stock as a commodity, but rather the stock as it represents a proportionate part of the enterprise as a whole. Thus, to find fair value, the trial court must determine the best price a single buyer could reasonably be expected to pay for the corporation as an entirety and prorate this value equally among all shares of its common stock. Under this method, all shares of the corporation have the same value. (Internal citations omitted)

In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc., 169 Vt. 82, 85-86 (1999). In arriving at a determination of fair value, this Court must consider all of the evidence presented by the corporation and the dissenters via a "fact-specific process." Id. at 86.

In this case, there are four major issues which the Court will address: (1) whether to consider the pending Omega litigation in the valuation; (2) whether the experts' consideration of the acquisition of assets through debt was proper in arriving at future cash flow; (3) whether the experts applied the appropriate discount rate; and (4) whether the application of a control premium was appropriate.

## I. The Effect of Pending Litigation

Chroma argues that the Court should consider the fact that litigation with Omega was pending on October 25, 2000 and that, because of the possibility that the litigation result would not be favorable to Chroma, it would seriously affect the fair value of Chroma on that date.

As of the valuation date, Chroma was defendant in a lawsuit brought by Omega, the company Chroma's founders and other employees previously worked for, for misappropriation

18

of trade secrets. After a lengthy bench trial, the trial court had already found in Chroma's favor in a 110 page order; but, Omega had appealed, and the appeal was still pending on the valuation date. This Court has reviewed the trial court's order, as a legal advisor to a potential, reasonable buyer would have done. The trial court's decision rested on two key factual findings: (1) that although process information the former Omega employees learned at Omega and later used at Chroma could have been protected as a trade secret, it was not, because Omega, at the time the former Omega employees learned this process information, did nothing to indicate to employees that the process information was confidential (and in fact downplayed confidentiality);[5] and (2) that, in any case, Omega had failed to prove damages. These factual determinations would be given great deference on appeal. See V.R.C.P. 52(a)(2)(trial court's findings of fact shall not be set aside unless clearly erroneous). And both would have to be set aside as clearly erroneous to produce a negative outcome for Chroma. Though such an occurrence was possible, it cannot be said to have been reasonably probable. Thus, the Court finds that a negative outcome to the litigation was not reasonably probable.

When a corporation is involved in litigation with the potential to seriously affect its value, the potential impact of a negative outcome should be considered in a fair value determination if a negative outcome is "reasonably probable," but not if a negative outcome is merely possible. MT Properties, Inc. v. CMC Real Estate Corp., 481 N.W.2d 383, 389-90 (Mn. Ct. App. 1992), citing Olson v. United States, 292 U.S. 246, 257 (1934) ("Elements affecting

---

[5] Essentially, this was a finding that the former Omega employees who started or joined Chroma had no duty of confidentiality with respect to this information – i.e., they did not know or have reason to know that the information was confidential. And as the Vermont Supreme Court noted in its subsequent opinion, "whether a duty of confidence attached is a factual

19

value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value – a thing to be condemned in business transactions as well as in judicial ascertainment of truth.")

In this case, based on its review of the trial court opinion which was on appeal on the valuation date, the Court has found that a negative outcome on appeal was not reasonably probable. The essence of the lower court decision was a determination that Omega had simply failed to prove its claim that Chroma had misappropriated trade secrets. This determination was based on two key factual findings by the court, both of which could only be set aside if clearly erroneous, and both of which would have to be set aside to produce a negative outcome for Chroma.

Despite the persuasive authority of MT Properties, the Court has considered the possibility of some sort of discount or reduction which would reflect the possibility of potential liability short of a reasonable probability. There is no precedent for such an approach, however; and even when asked by the Court, no expert could suggest a reasonable manner in which this could be done. The Court recognizes that it has discretion in determining value, but in the absence of any accepted methodology for considering a possibility that is less than a reasonable probability, it cannot fashion its own methodology for doing so.

Thus, having found that there was no reasonable probability that the pending litigation would result in a negative outcome for Chroma, the Court concludes that the litigation should not

inquiry." Omega v. Chroma, 174 Vt 10, 14 (2002).

be considered in determining fair value.

## II.  Consideration of Future Debt

Chroma's expert, in arriving at projected cash flow, did not take into consideration debt financing of future equipment; rather, he assumed that all equipment would be purchased with cash.  The Dissenters' expert, Mr. Gallagher, disagreed and assumed that debt would be used to finance future equipment purchases.  The Court finds that Gallagher's position is more credible.

Utilizing debt judiciously may and usually does result in favorable financial consequences.  One may assume that Chroma would aim to benefit from these favorable conditions.  In addition, Chroma had assumed some debt in the past to finance equipment and when the Dissenters' first valuation expert, Paul Toomey, discussed future cash flow with Chroma management, it was made clear to him that the company intended to finance equipment purchases with debt in the future.  Gordon flat out rejected any adjustment to future cash flow via debt financing and therefore did not assess the appropriateness of the numbers utilized by Gallagher.

The Court finds that the Dissenters' position on this issue is more credible based upon the evidence.  Debt had been used historically and members of the corporation had indicated their intent to do so in the future.  To completely reject this consideration in determining projected cash flow would be to ignore a pattern of behavior and the expressed intentions of management. Because no evidence was presented to contest the numbers used by Gallagher regarding future debt financing, the Court finds them credible.

## III.  The Discount Rate

In general, the Court is skeptical of Gordon's valuation, especially in the area of

21

determining the appropriate discount rate.  Gordon played a major role in the *Trapp* case, acting as the expert for the dissenters.  One can conclude that a *higher* fair value in that case would have been beneficial to the dissenters and that a *lower* fair value in the instant case benefits Gordon's current client, Chroma.  Gordon's work in both cases was inconsistent, which resulted in benefits to his clients in both cases.  For this reason, the Court accepts the valuation performed by Gallagher, the Dissenters' expert, as more credible, supported by the evidence, and based upon the procedures experts in the valuation field rely on.

First, Gordon applied a small stock premium of 5.4% to his analysis of the appropriate discount rate.  Although Gordon frequently relies on *Ibbotson* while arriving at these discount rates, he ignored the fact that the literature suggests that this small stock premium should be adjusted with beta information.  Gallagher did so and utilized a different figure.

Next, Gordon utilized a company specific risk factor of 3% where Gordon used a number of 2%.  Although Gene Laber contends this should not be considered, the Court will find that the 2% used by Gallagher is appropriate because both of the valuation experts in the case applied the company specific risk factor.  However, Gordon did not use one in performing his valuation in *Trapp.*  Finding that the higher the number used the more beneficial it is to Gordon's client, the Court is more skeptical about his position and  more confident in accepting the number suggested by Gallagher, especially considering Laber's suggestion that it is not a requirement to use one at all.

In sum, the Court is giving more weight to the discount rate arrived at by Gallagher, given Gordon's inconsistency in arriving at a discount rate in the cases in which he has been involved.  In addition Gallagher's work has been accepted as appropriate by another expert in the

22

field in almost all respects.

## IV.  The Control Premium

The Court is confident that a control premium should be applied in this case.  Most experts who testified agree that a valuation must take into account the effect of the purchase of a controlling interest in a corporation.  Only Gordon disagreed with this concept, after having already applied a control premium while working for the dissenters in the *Trapp* case.

Because the valuation done in this case reflects publicly traded minority interests, it is appropriate to account for the value of control in owning the corporation as a whole.  Trapp, 169 Vt. at 93.  A control premium is appropriate for this reason and because the projected cash flow arrived at by Gallagher was not adjusted to reflect decisions by a controlling purchaser.  Because Chroma rejected the use of a control premium, but did not contest the validity of the actual number used by Gallagher, 40%, the Court finds it appropriate.

In conclusion, for the above reasons, the Court will accept the valuation conducted by Mr. Gallagher in all respects.  The Court finds that his methods and conclusions have been supported by other evidence in the case and that the procedures he used are those commonly recognized by experts in the field of business valuation.  It should be noted that Gallagher's determination of fair value is supported by Cybron's expression of interest at a higher price and Millman's indication in the past that the corporation could be worth $25,000,000.  Gallagher's fair value is less than both of these numbers.

## V.  Costs, Expenses and Attorney's Fees

In considering the award of costs and expenses in this type of case, the statute provides that "[t]he court shall assess the costs against the corporation, except that the court may assess

costs against all or some of the dissenters, in amounts the court finds equitable, to the extent the court finds the dissenters acted arbitrarily, vexatiously, or not in good faith in demanding payment under section 13.28 of this title." 11A V.S.A. §13.31(a). There has been absolutely no evidence presented from which the Court can find that the Dissenters acted arbitrarily, vexatiously, or not in good faith in demanding payment. The findings and conclusions noted above support the position of the Dissenters to go forward and litigate this matter rather than accept the value of Chroma proposed by management. The Dissenters are awarded their costs.

Regarding legal fees and costs of experts, these may be awarded by the Court if the Court finds that either Chroma did not substantially comply with the requirements of the Dissenters' Rights Statute or one party acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by the statute. 11A V.S.A. §13.31(b)(1) and (2). The Court finds that Chroma did substantially comply with the requirements of the statute. There was evidence presented that Chroma management did notify the Dissenters of all of their rights under the statute. There is no evidence that management failed to take action when the Dissenters demanded payment. Although Chroma management was not well-versed in the requirement that "fair value" and not "book value" be determined, there is no indication that this was based on bad faith. Rather, the evidence suggests that Chroma management had previously always relied on book value in buying out departing employees and that management learned of its responsibilities in determining fair value after meeting with its attorneys. Ignorance of the law does not equate with bad faith. Chroma substantially complied with the requirements of the Dissenters' Rights Statute. Therefore, there will be no award for either party for expert or attorney's fees.

## VI.  Interest

The Dissenters are entitled to interest on the difference in the amount paid by the corporation and the appropriate amount based upon the fair value determined by the Court. 11A V.S.A. §13.30(e). The appropriate interest is "from the effective date of the corporate action until the date of payment, at the average rate currently paid by the corporation on its principal bank loans or, if none, at a rate that is fair and equitable under all the circumstances." 11A V.S.A. §13.01(4).

The Dissenters, in their memorandum of law filed with the Court, put the interest rate at 8%. However, the Court does not believe it has enough information before it at this time to determine the "rate currently paid by the corporation on its principal bank loans" or a "fair and equitable rate." In its order, the Court will require further filings on this issue.

## ORDER

1. The Court finds that the fair value of Chroma Technology Corporation is $10,900,000 as of October 25, 2000 or $287.00 per share based upon the 38,073 shares issued and outstanding at the time.

2. The Dissenters are awarded judgment as follows (with interest yet to be determined):

| | |
|---|---|
| Lee Madden: | 2,492 shares @ $287 per share = $715,204.00 minus book value paid @ $64.69 per share = **$553,996.52** |
| Carolyn Fulford: | 1,526 shares @ $287 per share = $437,962.00 minus book value paid @ $64.69 per share = **$339,245.06** |
| Rebecca Trumbull: | 119 shares @ $287 per share = $34,153.00 minus book value paid @ $64.69 per share = **$26,454.89** |

3. The parties are directed to consult with one another about the appropriate interest rate to be utilized by the Court. In the event the parties cannot agree, each party shall file any information and/or memorandum with the Court regarding this

issue within 30 days and the Court will make an order regarding the appropriate interest rate.

4. Also within 30 days, the Dissenters' shall file an affidavit with the Court detailing their costs as awarded above.

Dated:


_____
Karen R. Carroll
Presiding Judge